UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Civil No. 18-CR-80124-RUIZ/MATTHEWMAN

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

KENNETH BAILYNSON,

    Defendant.

_____/

FILED BY___*KJZ*___D.C.

*Sep 8, 2020*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## ORDER GRANTING DEFENDANT'S MOTION
## FOR RELEASE FROM PRETRIAL DETENTION [DE 225]

**THIS CAUSE** is before the Court upon Defendant, Kenneth Bailynson's ("Defendant")

Motion for Pretrial Release upon Conditions that Will Ensure the Court that the Defendant is not

a Flight Risk nor a Danger to the Community Based on Changed Circumstances ("Motion") [DE

225]. In effect, the Motion seeks release of the Defendant from pretrial detention. The Motion was

referred to the undersigned by the Honorable Rodolfo A. Ruiz, II, United States District Judge.

*See* DE 226. The Government has filed a response to the Motion [DE 230], and Defendant has

filed a reply [DE 231]. Defendant's FDC-Miami medical records have been filed by the

Government under seal [DE 238], and Defendant has filed his sealed Additional Grounds for

Release [DE 245]. The Court has very carefully reviewed all of the parties' papers and filings.

Additionally, the Court held an evidentiary hearing by Zoom video teleconference (VTC)

on August 26, 2020, and then heard additional oral argument and proffer on the Motion at a hearing

held by Zoom VTC on September 3, 2020. Defendant waived his physical presence in the

courtroom and consented to appear via VTC from the Federal Detention Center in Miami for both hearings.[1]

The Court orally announced its ruling granting Defendant's Motion for Pretrial Release, and ordering stringent conditions of release, at the September 3, 2020 hearing. This written Order follows:

## I.   <u>INTRODUCTORY STATEMENT</u>

Since the onset of the ongoing COVID-19 pandemic, the undersigned has considered numerous requests for release, or requests to reconsider or vacate a pretrial detention order, based upon COVID-19 concerns. These requests all present extremely difficult issues for the Court. In the majority of those cases, the Court has found that the motion or request lacked sufficient merit to persuade this Court to release the defendant in light of the serious risk of flight and/or danger to the community concerns when balanced against COVID-19 concerns, and other factors. *See, e.g.*, *United States v. Martinez*, 20-cr-80031, 2020 WL 4818903 (S.D. Fla. Aug. 19, 2020); *United States v. Martinez*, 20-cr-80031, 2020 WL 2517016 (S.D. Fla. May 14, 2020); *United States v. Kahn*, 19-cr-80169, 2020 WL 1582279 (S.D. Fla. Apr. 2, 2020).

That is, the existence of the COVID-19 pandemic does not mean that defendants who continue to present a serious risk of flight or nonappearance, or a danger to the community, must be released from detention. COVID-19 is not a "get out of jail free card." Rather, each motion and each defendant must be considered on a case by case basis.

---

[1] The Court found that the hearings could not be delayed without serious harm to the interests of justice and that Defendant's waiver of his personal appearance in Court and consent to appear by video teleconference as to both hearings was knowing and voluntary, with the advice of competent counsel.

This case, involving Defendant Kenneth Bailynson,[2] requires that he be released from pretrial detention, pursuant to 18 U.S.C. 3142(f), for a number of reasons. The Court previously detained Defendant on June 29, 2018, as a serious risk of flight or nonappearance [DE 86]. In light of the changed circumstances which exist today, and the new information that was not known to Defendant or the Court at the time of the hearing that has a material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance of the Defendant as required, *see* 18 U.S.C. 3142(f),  the Court will order Defendant released on stringent conditions. The Court will briefly summarize some of its rationale here, and then discuss it in more detail later in this Order.

First, the ongoing COVID-19 pandemic is a compelling factor which was not present when Defendant was initially ordered detained back in 2018; it is an important factor now in light of Defendant's serious underlying medical condition. Defendant suffers from Type 1 diabetes, as agreed by both medical experts who testified at the evidentiary hearing. Despite attentive care being given Defendant by the medical staff at FDC-Miami, his blood sugar level while in custody has at times exceeded 400. According to the CDC Guidelines, and the testimony at the evidentiary hearing held on this motion, the fact that Defendant has Type 1 diabetes puts him at great risk of death if he contracts COVID-19 at FDC-Miami. It seems clear to the undersigned that Defendant has a much lesser chance of contracting COVID-19 at home, on home confinement with severe restrictions, than he does in FDC-Miami.

Second, Defendant was arrested on or about June 26, 2018, and he has been held on pretrial detention for over 26 months as of the date of the evidentiary hearing. His trial is currently set for the two-week period beginning January 19, 2021. [DE 223]. If the trial proceeds on that date,

---

[2] Defendant is charged with numerous offenses, including healthcare fraud, wire fraud, and money laundering. [DE 3].

which is by no means certain in light of COVID-19 concerns and the representations of counsel for Defendant and the Government, Defendant will have been held on pretrial detention for approximately 31 months. As discussed later in this Order, such a lengthy period of pretrial detention raises due process concerns.

Third, at the time Defendant was ordered held on pretrial detention, he owned approximately 50 real estate properties and was earning $50,000 per month in rental income. Many of those properties were alleged to have been obtained by the proceeds of criminal activity. As of September 3, 2020, the Government has instituted criminal forfeiture proceedings against 45 of those properties, and lis pendens have been placed on the 45 properties. Further, Defendant does not have income. Although he does own a home valued at approximately $450,000 with no mortgage, and he also owns some nine condominium units in West Palm Beach worth approximately a combined total of $282,000, these properties appear to be subject to a large IRS lien. In any event, the Court is ordering that Defendant cannot encumber or transfer any of those properties. Thus, he no longer has significant assets and income which would enable him to flee as he did back in 2018 when ordered detained.

Fourth, at the time of his detention hearing in 2018, there was an allegation that Defendant was able to continue to engage in healthcare fraud through a company which he controlled, but that possibility no longer exists. Thus, he will not be able to engage in similar fraud while on pretrial release.

Fifth, Defendant has a four-year old child, and he is actively engaged in a custody battle with the mother of their child in a Palm Beach County paternity action. Defendant has a greater incentive to stay and litigate the custody issues and see his child, rather than flee.

Sixth, for the 26 months that Defendant has been on pretrial detention, in three different pretrial facilities, he has had zero disciplinary problems. This leads the Court to believe that he will comply with the court-ordered conditions of release.

Seventh, there are additional reasons which are contained in the sealed pleading the Defendant filed [DE 245], which the Court has considered in reference to the pending Motion.

Eighth, under the Bail Reform Act, the Court is instructed to release a defendant on the least restrictive conditions available. [3] At the time the Court ordered Defendant held on pretrial detention, the Court found that there was no condition or combination of conditions of release that would reasonably assure Defendant's appearance at trial. In light of the new evidence and facts presented, the Court does believe that stringent conditions of release can be ordered which will reasonably assure Defendant's appearance at trial and protect the community.

In sum, for numerous reasons, the Court no longer sees the need to hold Defendant on pretrial detention. Thus, the Court orders, pursuant to 18 U.S.C. 3142(f), that Defendant be immediately released from FDC-Miami. He shall be subject to home confinement, with location monitoring, and numerous other stringent conditions of release.

## II.     BACKGROUND

### A.  Procedural History

Defendant was arrested on or about June 26, 2018, and the Court held a detention hearing in this case on June 29, 2018. [DE 27]. At the detention hearing, the Government made a proffer, and the Court took judicial notice of the pretrial services report and Indictment in the case. *See* DE 86. Further, FBI Special Agent Frances Szczepanski and FBI Special Agent John Gerrity testified

---

[3] The Eleventh Circuit has instructed that the policy underlying the Bail Reform Act "is to permit the least restrictive condition compatible with assuring the future appearance of the Defendant." *United States v. Price*, 773 F.2d 1526, 1527 (11th Cir. 1985) (per curiam). The Court is doing that in this Order.

and were cross-examined by defense counsel. *Id*. The Court entered an 11-page Pretrial Detention Order noting the reasons why Defendant should be detained as a serious risk of flight or nonappearance despite his lack of a criminal history, and his United States citizenship. *Id.*; *United States v. Bailynson*, 18-cr-80124, 2018 WL 3323210 (S.D. Fla. Jul. 6, 2018). *Id.*

The Court found that the Government had met its burden to show, by a preponderance of the evidence, that there was a serious risk that Defendant would flee or fail to appear if released on bond or other conditions and that there was no condition or combination of conditions of release which would reasonably assure Defendant's presence in Court if Defendant were released. [DE 86, pp. 7-9]. The Court further explained that it found that Defendant presented an economic danger and that this could be considered as a relevant factor when determining whether Defendant posed a serious risk of flight or nonappearance. *Id.* at p. 9.

### B. <u>Defendant's Pending Motion for Release</u>

In the pending Motion, Defendant first points out that, as of July 23, 2020, he has been held at FDC-Miami for a period of 2 years and 25 days. [DE 225, p. 1]. He explains that he suffers from Type 2 diabetes[4] and other medical conditions and that his diabetes has not been controlled during his time at FDC-Miami. *Id.* at p. 2. Defendant argues that FDC-Miami's precautions are insufficient and that COVID-19 has infected all but three of the pods in the entire building. *Id.* According to Defendant, due to his diabetes and other medical conditions, he is at a very high level of risk of the virus causing his death. *Id.* He explains that the Honorable Judge Rodolfo A. Ruiz, II, United States District Judge, recently continued Defendant's trial until the trial calendar beginning January 19, 2021, and that even this new date is uncertain. *Id.* at p. 3. Defendant requests that the Court consider letting Defendant out on bond under house arrest at his West Palm Beach

---

[4] The evidence actually established that Defendant has Type 1 diabetes, which is the more serious variety.

residence with electronic monitoring and regular check-in services, as well as any special conditions the Court deems necessary. *Id.*

### C. **The Government's Response**

The Government argues that Defendant does not cite any statutory basis in his Motion, but he appears to be arguing that, under the Bail Reform Act, COVID-19 presents a "changed circumstance" sufficient to warrant bond. [DE 230, p. 1]. The Government points out that, although Defendant's health condition does make him more susceptible to the coronavirus, he does not actually currently have the virus, and he has been designated the lowest health care level possible in the Bureau of Prisons.[5] *Id.* The Government claims that this establishes that Defendant's diabetes is manageable. *Id.* at p. 6. It also points out that Defendant is only 48 years old. *Id.*

The Government concedes that Defendant has been in jail for more than two years awaiting trial since his arrest and detention, but notes that he has not opposed a single one of the numerous continuances in this case. [DE 230, p. 3]. According to the Government, Miami-FDC has 86 confirmed COVID-19 cases amongst inmates, and 35 confirmed cases amongst its staff, with one inmate death. *Id.* The Government acknowledges that the situation is serious, but claims that Defendant is ignoring the significant measures that BOP has taken at FDC-Miami. *Id.* at pp. 3-4.

The Government argues that, to the extent Defendant is relying on 18 U.S.C. § 3142(f), he is merely speculating that he might contract COVID-19 at Miami-FDC. [DE 230, p. 6]. However, courts must determine the extent to which the pandemic affects the release or detention of a criminal defendant on a case-by-case basis. *Id.* at pp. 6-7. The Government next contends that, to the extent that Defendant is arguing COVID-19 is a "compelling reason" justifying the "temporary

---

[5] Government counsel conceded at the August 26, 2020 hearing, that the Government recently determined that Defendant is actually at Care Level 2, and so Defendant does not have the lowest health care level designation as the Government previously thought.

release" of a person in pretrial custody, pursuant to 18 U.S.C. § 3142(i)(4), this argument is unavailing because Defendant seeks an indefinite, rather than a temporary, release from custody. *Id.* at p. 7. The Government asserts that the undersigned previously found that the weight of authority holds that the COVID-19 pandemic does not justify temporary release under Section 3142(i), in the case of *Martinez*, 2020 WL 2517016. *Id.* at pp. 7-8.

The Government next argues that it would be difficult to monitor Defendant during the pandemic. [DE 230, p. 11]. It also contends that releasing Defendant on bond "would cause the courts to be flooded with similar, generic requests, and would cause the wholesale release of defendants awaiting trial." *Id.*

**D.  Defendant's Reply**

Defendant first argues that his trial is realistically at least a year away. [DE 231, p. 1]. He next contends that FDC-Miami has not been able to properly manage his healthcare needs since he arrived there. *Id.* His blood glucose level is out of control (even over 400 at times) and is dangerous to his continued health. *Id.* Defendant argues that this issue alone should be a basis for releasing him from custody. *Id.*

Next, Defendant asserts that COVID-19 is rampant at FDC-Miami, and there is clearly a significant risk that Defendant will catch it at FDC-Miami. [DE 231, p. 2]. He emphasizes that all of the information concerning COVID-19 indicates that an individual suffering from Type 2 diabetes[6] is in the highest risk category for poor results if he should catch the virus. *Id.* According to Defendant, allowing him to "languish in the facility is a virtual death sentence to him if he should catch the virus." *Id.* Defendant rejects the Government's argument that, since he has been designated at the lowest health care level by the BOP, his health issue is manageable. *Id.* at pp. 1-

---

[6] *See* f.n. 4, *supra.*

2. He argues that "[t]here is nothing of an evidentiary value in the self-serving designation that BOP attaches to the healthcare of Mr. Bailynson" and points to Defendant's actual medical records to show that his diabetes is uncontrolled. *Id.* at pp. 1-2.

Defendant argues that he has provided an "extraordinary and compelling" reason for his release to home confinement—a chronic medical condition that has been identified by the Centers for Disease Control as elevating an inmate's risk  of becoming seriously ill from COVID-19— and that the same analysis for a compassionate release request has been used by United States District Judge Robert Scola in the case of *United States v. Sandra Huarte*, Case Number 1:11-CR-20588-RNS, and by several other judges in the Southern District of Florida. [DE 231, pp. 3-4]. He also argues that BOP's precautions have clearly not worked as the number of inmates testing positive for COVID-19 has continued to rise. *Id.* at. p. 4. Finally, Defendant contends that the Government's argument that releasing Defendant would open the floodgates on this type of motion is "absolutely heartlessly [and] callously absurd," as well as irrelevant. *Id.* at p. 5.

### III.   THE AUGUST 26, 2020 EVIDENTIARY HEARING

At the evidentiary hearing, both sides moved into evidence Defendant's medical records, which are filed under seal [DE 238] and shall stay under seal. Defense counsel called two witnesses, Dr. Robert Sackstein and Defendant. The Government called one witness, Dr. Charles Howard. The parties agreed to allow the two doctors to listen to one another's testimony in order to streamline the hearing. The parties also agreed to allow both doctors to appear at the Zoom VTC hearing via telephone rather than by video. At the conclusion of the hearing, the Court directed Defendant to file a written sealed proffer so that Defendant's confidential information would not be discussed in open court. The Government agreed to this procedure, and the Defendant subsequently complied [DE 245].

The testimony of the three witnesses is summarized below.

**A.  <u>Dr. Robert Sackstein</u>**

Dr. Robert Sackstein testified first on behalf of Defendant. The Government did not object to him being admitted as an expert. Defendant has filed Dr. Sackstein's Curriculum Vitae on the docket. [DE 235-1]. Dr. Sackstein is currently the Vice-President for Health Affairs, Florida International University; Dean, Herbert Wertheim College of Medicine (HWCOM); Professor, Department of Translational Medicine (HWCOM); Professor Emeritus, Harvard Medical School; and Program Director, Harvard Career Development Program in Translational Glycobiology. *Id.* He also has a PhD in immunology. Dr. Sackstein has expertise in COVID-19, and he has devoted his life to understanding immune systems' methods of defending themselves. The Court finds him to be extremely well qualified to opine on issues related to COVID-19, including its effect on individuals with Type 1 diabetes.

Dr. Sackstein discussed the effects of COVID-19 on the immune system and how a profound drop in white cells (lymphocytes) leads to decompensation in immune mechanisms. He testified as to the effects that diabetes has on organ damage, how diabetes causes dysregulation of the immune system, and how a compromised immune system can lead to hyper-aggressivity in the immune system's response. Dr. Sackstein also testified that, when it comes to COVID-19, diabetic complications can cause an inordinate amount of tissue damage.

Dr. Sackstein has reviewed Defendant's FDC-Miami medical records. He explained that, while blood glucose levels do not directly matter with regard to COVID-19, poor glucose control worsens the capacity of the immune system to function appropriately and increases the likelihood that an individual will accumulate end organ damage. High glucose levels also lead to contracted blood levels, which may be a possible contributor to an individual being susceptible to COVID-

19. Dr. Sackstein stated that Defendant Bailynson is at a much higher risk of death if he catches COVID-19, and that FDC-Miami is a dangerous place for Defendant to be since he suffers from insulin-dependent, Type 1 diabetes. There is also a high risk of Defendant possibly dying if he catches the virus. According to Dr. Sackstein, diabetic individuals are at an incredibly high risk of morbidity and outright mortality from COVID-19.

Dr. Sackstein next testified that Defendant's high glucose levels are not FDC-Miami's fault; he acknowledged that it is difficult to monitor Defendant's levels when he cannot get the right nutrition and is under stress. Dr. Sackstein further explained that, before he was arrested, Defendant was receiving long-lasting insulin—Tresiba—which lasts 48 hours. FDC-Miami is currently providing him with intermediate-acting insulin in combination with short-acting insulin. Additionally, FDC-Miami is only testing Defendant twice a day, but, given Defendant's blood glucose levels, he needs glucose monitoring four times a day. Defendant's medical records show that his blood glucose levels have been in the 300s and 400s; however, even if they were managed down into the low 100s, Defendant would still have the same risk of a terrible outcome should he catch COVID-19. Dr. Sackstein acknowledged that Defendant's commissary records show that he has purchased foods high in sugar, which contributes to his high blood glucose levels.

In Dr. Sackstein's opinion, Defendant would be much safer in isolation at home where he could distance himself from COVID-19 positive individuals, rather than in a high-density location like FDC-Miami. Individuals can infect others from 5-7 days before they become symptomatic. Additionally, many people do not realize they have the virus at all. Thus, anyone who is at higher risk of infection should be shielded. Finally, the effect of any future vaccine may not be as favorable in a diabetic as in a healthy person.

Dr. Sackstein also gave rebuttal testimony. He stated that an individual generally would not go from injectable insulin to Metformin (an oral medication). He also discussed the very high level of insecurity about whether people have or do not have the virus. Dr. Sackstein testified that FDC-Miami is using best practices, but he stated that, in his opinion, this still is not enough in Defendant Bailynson's case due to his underlying health condition.

## B.  Dr. Charles Howard

Dr. Charles Howard testified on behalf of the Government. Dr. Howard has been the Clinical Director at FDC-Miami since December 2016 and is responsible for the medical care of all inmates at FDC-Miami. He previously worked at FDC in Massachusetts from 2002 through 2016 years. He is a trained ophthalmologist.

Dr. Howard was offered by the Government to provide testimony in his capacity as a treating physician of Defendant Bailynson, not as an expert. He has reviewed Defendant's records, has treated Defendant himself, and has reviewed other healthcare professionals' treatment of Defendant. He is a trained medical doctor and has been with the Bureau of Prisons for many years.

At the outset of discussing his testimony, the Court finds that Dr. Howard is an excellent medical professional doing the best he and his medical staff can do to treat inmates at FDC-Miami in light of the sudden and unprecedented COVID-19 pandemic. Based upon his testimony, and this Court's review of the FDC-Miami medical records of Defendant, the Court finds Dr. Howard to be an earnest and dedicated medical doctor who is doing everything in his power to cope with the COVID-19 pandemic in the FDC-Miami detention facility. This Court's Order requiring the release of Defendant Bailynson is not intended to be a criticism of Dr. Howard or the manner in which FDC-Miami medical staff are responding to the COVID-19 pandemic. In fact, the Court was impressed with Dr. Howard's efforts, and those of his medical staff, in this regard.

Dr. Howard testified that Defendant arrived at FDC-Miami in March 2019 (after being transferred there from the Palm Beach County Jail). Defendant reported a history of diabetes and reported that he had been taking Tresiba and Novolog (both injectables) prior to his arrest. However, he was only taking an oral medication, Metformin, when he arrived at FDC-Miami. A few days after his arrival, a detailed medical history was taken, and routine screenings were completed. Defendant was put on sliding scale coverage of diabetes medication. His initial blood glucose level was 237, and his initial A1C level was 8.5.

Dr. Howard personally saw Defendant in May 2019. At that point, Defendant's blood glucose levels were between 220 and 400. Dr. Howard discussed Defendant's diet with him and adjusted Defendant's medications.   Later in May of 2019, Defendant's insulin was adjusted multiple times under Dr. Howard's direction.

As per FDC-Miami's protocol, Defendant's blood sugar is monitored twice a day. This frequency of monitoring seems to be working for most diabetics. Defendant's blood glucose levels have ranged from the 200s to 300s during his time at FDC-Miami, but have never gone below 160. Defendant's A1C was 10.1 in September 2019, and it was 9.9 in May 2020. Defendant's most recent blood sugar reading at FDC-Miami prior to the hearings in this case was 218, which is not significantly different than his first blood sugar of 237 taken at FDC-Miami. His blood sugar levels are now consistently between 170 and 230. Defendant has shown up for insulin line on a regular basis. He usually needs some supplemental insulin and receives it.

According to Dr. Howard, Defendant is on a diabetic diet at FDC-Miami. The Government's Exhibit 1 consists of records of Defendant's commissary purchases from April 2019 through August 11, 2020. He has bought large quantities of candy bars, chips, soda, fruit punch, and other items high in sugar content. Dr. Howard testified that these purchases were inappropriate

for a diabetic and that he and other mid-level practitioners have tried to educate Defendant regarding the proper nutrition for a diabetic individual. Dr. Howard explained that he can determine Defendant's medical needs because he can track what Defendant eats and that it would not be appropriate to constantly raise Defendant's insulin levels when Defendant's eating habits have contributed to his blood sugars being under poor control.

According to Dr. Howard, there have been only 96[7] COVID-19 positive inmates, most of whom arrived after FDC-Miami entered a lockdown in early March 2020. This is a small percentage of the approximately 1500 inmates. Approximately 30 staff members have tested positive, and they are all back at work already. Two inmates at FDC-Miami who tested positive for COVID-19 have died. They both had multiple co-morbidities, and both had recently visited the hospital for unrelated medical problems. Any inmate who tests positive at FDC-Miami is moved to an isolation unit until he or she either tests negative or has been in isolation for 14 days. As of the time of the evidentiary hearing on Defendant's Motion, there were 15 people in isolation who have tested positive.

Dr. Howard explained FDC-Miami's safeguards as follows. Medical personnel examine anyone who is exhibiting symptoms the very same day. Currently, neither inmates nor staff members are tested unless they are symptomatic. Everyone who enters the facility has his or her temperature taken. Inmates and staff wear face masks. Inmates are not in close proximity to officers and are never within six feet of them. Visitation has been shut down since the beginning of March 2020. Inmates travel throughout the facility to make phone calls in cohorts. All common rooms are disinfected after use. Every inmate is currently in a lockdown unit, and this will continue until the central office comes out with a new program. Defendant's housing unit has had no cases

---

[7] Dr. Howard originally testified that 80 inmates had tested positive to the best of his knowledge, but he then agreed that the BOP website's reporting of 96 was probably accurate. This was as of August 26, 2020.

of COVID-19. Defendant is locked in his cell except to pick up food, bathe, go on the computer, and make phone calls. He has been housed alone or with only one other cellmate since March 2020 and is only out of his cell for short periods of time.

### C.  Defendant Kenneth Bailynson

Defendant testified that, while masks are required at FDC-Miami, inmates and guards are not wearing them properly. There are often 50 people in line to use the computers, and approximately 25% of them wear masks that are not actually covering their faces. Many inmates and staff allow their face masks to hang around their necks. Defendant also stated that guards do not maintain six feet of distance. He explained that inmates are separated into pods of approximately 30 people, but that the pods are not fully isolated from one another. Moreover, because Defendant's floor has no COVID-19 cases, staff is pulling inmates from Defendant's floor to help in different sections of the facility and even to clean other floors of the facility where there have been positive cases.

Defendant stated that he is not on a special diabetic diet and has never been on one during his time at FDC-Miami. He also stated that he is not permitted to exercise. Defendant testified that, prior to his arrest, he took Metformin, Tresiba, and Novolog. He was given different insulin medications at Palm Beach County Jail and the Rock Road facility. Despite Dr. Howard's testimony, he had been taking both Metformin and injectable insulin medications immediately prior to his arrival at FDC-Miami. According to Defendant, FDC-Miami's policy is to starve the inmates for insulin and intentionally provide insufficient coverage because hypoglycemia can cause such an acute medical emergency. Defendant has seen other inmates with blood glucose levels in the 300s, 400s, and 500s.

## IV.    <u>THE SEPTEMBER 3, 2020 HEARING</u>

At the September 3, 2020 hearing, defense counsel argued that, if Defendant were released, he would reside at his West Palm Beach home alone.  He owns his home solely in his name, he has no mortgage on it, and its fair market value is between $400,000 and $500,000. However, there is an IRS lien on the home. Defense counsel explained that Defendant has received no rental income from his other properties since he was incarcerated. With regard to his other current assets, Defendant has approximately $150,000 in trust accounts with the attorney representing him in his pending civil matters. He plans to live off that money if released as he would have very low expenses.

Defense counsel explained that Defendant has had no disciplinary reports in 26 months at three different institutions. Defendant has a four-year-old child and is currently involved in litigation over parental rights and custody. Defendant's release would help him in his child custody battle. Defense counsel argued that Defendant's January 2021 trial date may be further delayed and that defense counsel probably would not even be ready for a January 2021 jury trial because counsel has had so little contact with Defendant while he has been incarcerated. Defense counsel is hopeful that the case may be resolved pre-trial.

Finally, defense counsel made several additional arguments supporting Defendant's request for pretrial release. Counsel asserted that Defendant would be much safer at home, and that, if he caught COVID-19, it would be devastating to his health and likely fatal. Counsel also asserted that Defendant's financial condition has dramatically changed, he now has an established history of compliance due to his lack of disciplinary reports, the pandemic started after Defendant's detention hearing, no one could have foreseen how long Defendant would be incarcerated pre-trial, and, if Defendant resolves this case pre-trial, he could be facing 6.5 years in prison instead

of the 23.5 to 27.3 years that was predicted in 2018. Finally, Defendant points out that there was a concern at the 2018 detention hearing that Defendant was participating in an ongoing fraudulent testing business through another person. However, Defendant is involved in extremely contentious custody proceedings with her, and that business is no longer in existence

Government counsel explained that Defendant still owns nine rental condominiums (three in his individual name and six in the name of his business) that do not have lis pendens on them. Those properties are worth a combined total of approximately $282,000. The Government could not trace the fraud proceeds to the rental units, so the Government could not encumber them. However, the IRS has a very large lien on all of Defendant's properties. Additionally, Government counsel expressed that he is hopeful there will be a resolution of the criminal case as to Defendant. He acknowledged that the January 2021 trial date may simply be aspirational.

Government counsel made several arguments in favor of denying Defendant's Motion. He cited to the legal precedent of the undersigned and noted that reconsideration of detention is not common. Government counsel distinguished compassionate release from release under the Bail Reform Act. He asserted that, pursuant to the applicable case law, the existence of the COVID-19 pandemic and the fact that Defendant suffers from diabetes are not sufficient factors to support Defendant's release from detention. According to the Government, Defendant is still a flight risk. Counsel acknowledged that COVID-19 is a serious problem in the federal prison system, but argued that FDC-Miami can continue to care for Defendant, and the incidence of infection there is lower than in certain areas of South Florida. Government counsel also argued that Miami-FDC may not be a perfect environment, but they are taking care of Defendant and providing injections; Dr. Sackstein's only real complaint was that Defendant needs more monitoring of his glucose levels.

With regard to the change in circumstances, Government counsel argued that Defendant is still facing a substantial amount of prison time however this case turns out (unless, of course, he goes to trial and is acquitted). Counsel maintained that Defendant still has some financial means in that he is paying his civil and criminal lawyers, has unencumbered properties, and allegedly made approximately $15 million from his fraud.  In sum, the Government is concerned that, even though the situation has changed, Defendant is still a flight risk.

## V.      LEGAL STANDARD

The policy underlying the Bail Reform Act "is to permit release under the least restrictive condition compatible with assuring the future appearance of the defendant." *United States v. Price*, 773 F.2d 1526, 1527 (11th Cir. 1985) (per curiam). When the United States seeks to detain a criminal defendant pending trial based on his status as a flight risk, it must prove by a preponderance of the evidence that no condition or set of conditions will reasonably assure his presence at trial. *United States v. Medina*, 775 F.2d 1398, 1402 (11th Cir. 1985). By contrast, where the Government seeks to detain a defendant based on a contention that he is a danger to the community, it must show by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community. *Id.* The reopening of a pretrial detention hearing by the Court is authorized pursuant to the last sentence of 18 U.S.C. 3142(f), discussed in the next section of this Order.

## IV.      18 U.S.C. § 3142(f) DISCUSSION AND ANALYSIS[8]

Defense counsel relied on the last sentence of 18 U.S.C. § 3142(f) of the Bail Reform Act when arguing in support of Defendant's pretrial release at the hearing on the Motion. And, the Court is granting Defendant's Motion under 3142(f). The last sentence of 3142(f) provides that:

---

[8] The Court is granting the Motion under 3142(f) and not under 18 U.S.C. § 3142(i). Therefore, the Court shall not analyze 3142(i) in this Order.

The hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

§ 3142(f). The Court, after careful review of Defendant's medical records, the parties' papers, the testimony of the two medical doctors, the testimony of Defendant, the arguments and evidence provided at the hearings, and the sealed filing by Defendant, finds that there is, in fact, information that was not known to Defendant or the Court at the time of the 2018 detention hearing and that this information has a material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance of Defendant as required and the safety of any other person and the community. There is a substantial change in circumstances in this case.

### A.  The COVID-19 Pandemic and Defendant's Diabetic Condition

There has been an unforeseen a global pandemic that has resulted in over 185,000 deaths within the United States and has had a disproportionate effect on jails and prisons. The ongoing pandemic is a serious problem that did not exist when the Court detained Defendant. Moreover, COVID-19 is inarguably more harmful to diabetic individuals than those that are not suffering from the disease. Defendant is at a great risk of death if he contracts COVID-19, and he is at a greater risk of contracting the virus at FDC-Miami than alone in his home. In this regard, the Court finds the following comments of Judge Rodolfo A. Ruiz, II, to be compelling:

> On this point, CDC Guidelines support Petitioners' claim, finding that "incarcerated/detained populations have higher prevalence of infectious and chronic diseases and are in poorer health than the general population, even at younger ages. *See* CDC Guidelines at 16. This is likely due to the inherent design and operation of detention centers [citation omitted]."

*Matos v. Lopez Vega*, 20-civ-60784, 2020 WL 2298775, * 7 (S.D. Fla. May 6, 2020). Although Judge Ruiz's comments were made in the context of a civil case filed by immigration detainees

against the ICE Officer in charge of the Broward Transitional Center, they are also applicable to any detention facility such as FDC-Miami. As hard as FDC-Miami tries to protect its inmates from COVID-19, it is clear that Defendant Bailynson will be much less susceptible to contracting COVID-19 on very restricted home confinement than he is in FDC-Miami.

The Court notes that there have been several cases in the Southern District of Florida where courts have granted defendants compassionate release from prison based on diabetes and other medical conditions. *See United States v. Brown*, 14-cr-60161, 2020 WL 5116781 (S.D. Fla. Aug. 31, 2020) (J. Bloom) (compassionate release granted for defendant with Type 2 diabetes and high blood pressure); *United States v. Laing*, 18-cr-20731, 2020 WL 5032977 (S.D. Fla. Aug. 24, 2020) (J. Scola) (compassionate release granted for defendant with chronic medical conditions); *United States v. Wooley*, 19-cr-80093, 2020 WL 4904210 (S.D. Fla. Aug. 20, 2020) (J. Rosenberg) (compassionate release granted for defendant with Type 2 diabetes and obesity); *United States v. Siegert,* 13-cr-80009, 2020 WL 4726929 (S.D. Fla. Aug. 13, 2020) (J. Altonaga) (compassionate release granted for defendant with chronic health issues); *United States v. Weems,* 18-cr-60185, 2020 WL 4558381 (S.D. Fla. Aug. 7, 2020) (J. Bloom) (compassionate release granted for defendant with Type 2 diabetes and other medical issues); *United States v. Minsal,* 18-cr-20797, 2020 WL 4516360 (S.D. Fla. Aug. 5, 2020) (J. Altonaga) (compassionate release granted for defendant who is obese and asthmatic); *United States v. Feucht,* 11-cr-60025, 2020 WL 2781600 (S.D. Fla. May 28, 2020) (J. Middlebrooks) (compassionate release granted for defendant with Type 2 diabetes and other medical issues); *United States v. Welch,* 09-cr-60212, 2020 WL 4333667 (S.D. Fla. May 21, 2020) (J. Marra) (compassionate release granted for defendant with Type 2 diabetes and other unique issues). While motions for release from pretrial detention based on a defendant's underlying medical condition in light of the COVID-19 pandemic require a somewhat

different analysis than do compassionate release motions based on such grounds, they nonetheless do have many things in common. Importantly, both types of motions deal with the serious effects of the COVID-19 pandemic on incarcerated defendants who have serious underlying health or medical issues. To such extent, this District's compassionate release cases cited above do inform this Order, and they have been considered by this Court in granting Defendant Bailynson's release.

The Court also finds Defendant's testimony, that inmates and guards are not consistently wearing their masks properly, to be credible. The Court accepts Dr. Howard's credible testimony that the policy of FDC-Miami is that all inmates and staff are to wear face masks. However, the Court also accepts Defendant's testimony that, from what Defendant has observed, such policy is not always consistently followed by all inmates and staff.

Despite the best efforts of Dr. Howard and his medical staff at FDC-Miami, Defendant's diabetes has been somewhat uncontrolled at times while he has been in custody. The medical records and testimony establish that Defendant has had high blood glucose levels into the 400s while incarcerated there. Although FDC medical staff seem to have now stabilized Defendant's blood glucose level, Defendant will be able to monitor his blood glucose levels more often each day while on home confinement than the two times per day that FDC-Miami monitors such levels. While this is not the most compelling factor to the Court, especially in light of Defendant's commissary records, it is a factor for consideration.

### B.  <u>The Length of Defendant's Pretrial Detention</u>

It could not have been foreseen back in 2018 at the time of the pretrial detention hearing that Defendant would be held in pretrial custody for so long. Defendant has now been detained pretrial in this case for 26 months, and, if he goes to trial in January 2021, which is not at all certain, he will have been in custody for 31 months. At some point, the Court is concerned about

a possible due process violation. *See United States v. Haynes,* 19-cr-80045, 2019 WL 5538300 (S.D. Fla. Oct. 28, 2019) (finding that 9 months pretrial detention did not violate due process); *United States v. Gonzales-Claudio*, 806 F.2d 334, 339 (2d Cir. 1986) (finding that 14 months pretrial detention violated Due Process); *United States v. Zannino*, 798 F.2d 554, 548 (1st Cir. 1986) (finding that 16 month delay in most cases violates Due Process); *United States v. Quartermaine*, 913 F.2d 910, 918 (11th Cir. 1990) ("We hold the prospect of eight to ten months of pretrial detention, without more, does not mandate the release of a defendant for whom pretrial detention is otherwise appropriate.").

The Court notes that the COVID-19 pandemic was not a factor when the preceding opinions were issued, and they must be considered with that caveat in mind. The ongoing pandemic will necessarily lengthen periods of pretrial detention as jury trials have been continued in this district until January 4, 2021. *See* Administrative Order 2020-53 issued by Chief District Judge K. Michael Moore. Therefore, the preceding opinions' discussion of the length of detention necessary to raise a due process concern or violation may not be fully relevant during the disruptive period caused by the COVID-19 pandemic. Nonetheless, they are instructive that lengthy periods of pretrial detention can, depending upon the facts of each case, violate due process.

Here, there is clearly more than just the prospect of a lengthy period of pretrial detention. There is, in fact, 26 months of pretrial detention currently, and the prospect of 31 months or more of pretrial detention depending on when the case goes to trial, or results in a guilty plea. Although such a lengthy period of pretrial detention, or longer, may be entirely appropriate and not violative of due process during the unprecedented COVID-19 pandemic in an appropriate case where serious risk of flight or danger concerns remain, the Court no longer has such concerns here. The Court can safely avoid any due process concerns here by releasing Defendant Bailynson on home

confinement with location monitoring and other strict conditions. Thus, the Court has considered Defendant's lengthy period of pretrial detention in this case as a factor justifying his release.

C. **Defendant No Longer Has the Significant Financial Assets He Had at the Time of the Pretrial Detention Hearing**

The Government has initiated preliminary forfeiture proceedings on all but approximately 10 of Defendant's properties and has placed lis pendens on 45 of them, which was not the case at the time of the pretrial detention hearing. Furthermore, Defendant is not receiving any rental income from his rental properties, while he had been receiving $50,000 per month at the time of the detention hearing. Thus, it seems that all of Defendant's money that is tied up in real property is not accessible to him to flee. There is also a very large IRS lien on Defendant's properties. It appears to the Court that Defendant no longer has available to him the assets which might allow him to flee. Moreover, as to the Defendant's remaining home and 9 condo properties, the Court has tied them up as collateral for Defendant's $750,000 personal surety bond in this case.

D. **Defendant's Sealed Filing**

Defendant has provided additional bases for his release in his sealed filing dated September 1, 2020 [DE 245]. The Court has considered the contents of the sealed filing in issuing this Order.

E. **Defendant No Longer Has the Ability to Continue His Allegedly Fraudulent Business if Released**

Defendant can no longer engage in an allegedly fraudulent testing business with the mother of his child as the business no longer exists and Defendant and the mother of their child are going through a contentious paternity case involving a custody battle. Therefore, there is no longer the same danger to the community concern which existed at the time of the initial detention hearing in 2018.

**F.   Defendant Has Had No Disciplinary Reports in 26 Months of Pretrial Detention**

Defendant has been in custody for 26 months at three different institutions and has had no disciplinary issues. This leads the Court to believe that Defendant will follow all conditions of release set by the Court, just as he has followed all of the rules and regulations of the detention facilities where he has been held in this case. Further, Defendant has been warned of the consequences of his failure to appear, or failure to comply with the conditions of release, and the Court believes that Defendant will keep his promise to the Court and follow all of the court-imposed conditions of release to the letter.

## IIV.   CONCLUSION

Based on the foregoing, the Court is compelled to **GRANT** Defendant's Motion [DE 225] and order that he be released from custody forthwith, pursuant to 18 U.S.C. 3142(f). At this point in time, and taking into consideration the change in circumstances, the Court finds that there now exist conditions of release which will reasonably assure the appearance of the Defendant as required and the safety of the community. The Court has set stringent bond conditions, including home confinement, location monitoring, restraints on his remaining assets, a $750,000 personal surety bond, and other stringent conditions of release. *See* Defendant's Bond at DE 248. The Court finds that these conditions of release will reasonably assure Defendant's appearance at trial and the safety of the community.

**DONE and ORDERED** in chambers at West Palm Beach, Palm Beach County, in the Southern District of Florida, on the 8th day of September, 2020.

William Matthewman

WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE