```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                   WEST PALM BEACH DIVISION
                   CASE NO. 9:18-cr-80124-RAR-1
 3
    UNITED STATES OF AMERICA,
 4
              Plaintiff,                    April 20, 2022
 5                                          2:27 p.m.
              vs.
 6
    KENNETH BAILYNSON,
 7
              Defendant.                    Pages 1 THROUGH 53
 8   _____

 9                  TRANSCRIPT OF SENTENCING
            BEFORE THE HONORABLE RODOLFO A. RUIZ, II
10                UNITED STATES DISTRICT JUDGE

11   Appearances:

12   FOR THE GOVERNMENT: US DOJ
                         JAMES V. HAYES, ESQ.
13                       1400 New York Avenue NW, 8th Floor
                         Washington, DC 20005
14
     FOR THE DEFENDANT:  J. DAVID BOGENSCHUTZ & ASSOCIATES
15                       J. DAVID BOGENSCHUTZ, ESQ.
                         PATRICK WILSON, ESQ.
16                       633 Southeast 3rd Avenue, Suite 202
                         Fort Lauderdale, Florida 33301
17
                         BENJAMIN & AARONSON
18                       JAMES SCOTT BENJAMIN, ESQ.
                         1 Financial Plaza, Suite 1615
19                       Fort Lauderdale, Florida 33394-2843

20   COURT REPORTER:     Yvette Hernandez
     (via Zoom)          U.S. District Court
21                       400 North Miami Avenue, Room 10-2
                         Miami, Florida 33128
22                       yvette_hernandez@flsd.uscourts.gov

23   ALSO PRESENT:       AMANDA PERWIN, ESQ.
                         BILL STEWART, ESQ.
24                       CHRISTOPHER REID, ESQ.
                         REBECCA WALTON, ESQ.

25
```

```
1        (Call to order of the Court, 2:27 p.m.)

2             THE COURT:  All right.  Thank you, everyone, for your

3    patience.

4             Let's go ahead and go back to the regularly scheduled

5    programming for today.  We're here this afternoon in the matter

6    of United States of America v. Kenneth Bailynson.  This is Case

7    Number 18-80124.

8             Let's go ahead and get appearances for the record.  On

9    behalf of the Government, who do we have here today?

10            MR. HAYES:  Good afternoon, Your Honor.  Jim Hayes for

11   the United States.  With me at counsel table is Amanda Perwin

12   and also Bill Stewart, Christopher Reid, and Rebecca Walton.

13            THE COURT:  All right.  Good afternoon to everyone.

14            And on behalf of Mr. Bailynson?  Gentlemen?

15            MR. BOGENSCHUTZ:  Good afternoon, Your Honor.  Dave

16   Bogenschutz and Patrick Wilson on behalf of Mr. Bailynson.

17            MR. BENJAMIN:  Good afternoon, Your Honor.  Jamie

18   Benjamin, also co-counsel on behalf of Mr. Bailynson.

19            Good afternoon.  Thank you for the civil --

20        (Cross talk.)

21            THE COURT:  I'm giving you extra time to hear about a

22   bankruptcy before your sentencing, but thank you for indulging

23   us.

24            All right.  And I do have my representative from

25   Probation here.  State your appearance, please.
```

```
1              PROBATION OFFICER:  Yes.  Good afternoon, Your Honor.

2    Aundrea Caldwell on behalf of the United States Probation

3    Office.

4              THE COURT:  Good to see you, Ms. Caldwell.

5              For those that are in court, and feel the need to have

6    a mask on, you're free to do so.  You are also free to remove

7    your mask.  If you wish, you can take them off.  Okay?  When

8    you're in Judge Ruiz's courtroom, that's fine.

9              All right.  So let's go ahead and jump into our

10   Presentence Investigation Report.  The total offense level is a

11   35.  The criminal history category is a I.  We know that that

12   exceeds the statutory maximum and therefore the advisory

13   guidelines call for the stat max of 120 months, followed by one

14   to three years of supervised release, a fine of 40,000 to

15   250,000 dollars, restitution in the amount of $31,356,527, and

16   a special assessment of $100.

17             Now, we have a number of objections that we need to

18   address.  I will confess, reviewing them, I don't know that all

19   of them actually have an impact on sentencing.  A lot of them

20   were more to clear up the record, and I totally agree with

21   Defense counsel in doing so.  But I don't know that necessarily

22   a lot of them are really going to have a major impact.  I think

23   we'll try to focus on the ones that are addressed in the

24   addendum by Probation, which are the ones that, in my view, may

25   have more of an impact.  And you guys can let me know if some
```

1    of this has been resolved.

2              I know that the first one dealt with the fine, which

3    was an issue of whether or not under the Plea Agreement we

4    could impose a fine of up to 250,000 or not more than greater

5    of twice the pecuniary gain derived from the Defendant or twice

6    the gross pecuniary loss suffered by any person resulting from

7    the offense.  And since the loss was 31 million and change,

8    twice would be 62 million.  That was the first issue.  You want

9    to address that?

10             MR. BOGENSCHUTZ:  Yes, Judge.

11             That issue, although it hasn't been specifically

12   resolved, as far as we're concerned, it is resolved.  That is

13   the law.  We're not pushing forward on that.

14             THE COURT:  So we don't have an issue with that.

15   Right?

16             Okay.  All right.  So we can withdraw that.

17             MR. BOGENSCHUTZ:  I can actually tell you what I

18   think --

19             THE COURT:  Tell me what you have left maybe.  Because

20   there's been a lot.  And maybe since then, you guys have

21   streamlined it.  What do you have left?  Tell me.

22             MR. BOGENSCHUTZ:  The only thing we really have left

23   on the objections is the issue about what restitution is.  The

24   Government and I, as well as Mr. Benjamin, have discussed this.

25   And because there are outstanding monies that have been repaid,

1    we've agreed, with the Court's permission, to hold off on that

2    until we can reach an agreement between us as to what that

3    number really is south of 31 million plus.

4          THE COURT:  Okay.  So stated another way, we want to

5    do a TBD, or to-be-decided, on restitution.  We can reset it

6    for a restitution hearing maybe 30 days out, give you guys a

7    chance to kind of figure out what he's remitted, figure out

8    what the balance is, shaving money off that 32 million.

9          MR. BOGENSCHUTZ:  That's exactly correct, Judge.

10         THE COURT:  Okay.  Mr. Hayes, are you in agreement

11   with that?

12         MR. HAYES:  Absolutely, Your Honor.

13         THE COURT:  So is it fair to say that all other

14   objections that have been lodged have been withdrawn?  And

15   absent an agreement as to restitution, that the Government has

16   no objection to the calculations?  Is that right?

17         MR. HAYES:  That's correct, Your Honor.

18         THE COURT:  On the Defense?

19         MR. BOGENSCHUTZ:  That is correct.

20         THE COURT:  All right.  So the Court is then able to

21   adopt the PSI without objection, because all objections have

22   either been resolved, withdrawn, or do not have an impact on

23   the Court's decision as to sentencing, as agreed to by the

24   parties.  And I will make it clear that restitution will be put

25   in the judgment and sentence with a future date.  We'll pick it

```
 1    at the end of today's sentencing.  We'll get back together when
 2    we run the numbers and figure out the correct amount for that.
 3            So now that that has been addressed and we're back to
 4    the statutory maximum, I think probably the easiest thing to
 5    address first and foremost would be the 5K.  My understanding
 6    is it's -- 40 percent is being requested on the 5K, which
 7    brings it down from 120 months, the statutory maximum of 10
 8    years that the Plea Agreement did foresee, to, I believe, 72
 9    months.  Is that right, Mr. Hayes?
10            MR. HAYES:  That's correct, Your Honor.
11            So the only issue then is I think Defense wants to
12    argue it should be more.  That's really the only issue for this
13    sentencing.
14            THE COURT:  Right.  Right.  Very good.
15            They want to argue that.  They also have some other
16    motions; remand, placement, things like that.  I read all that.
17            But again, the important thing is you, the
18    Government -- the Government is prepared to start at 72 months,
19    for lack of a better term.  And you believe it should not be
20    less than 72 months.  Am I fair in saying that?
21            MR. HAYES:  Correct, Your Honor.  I'll explain.
22            The Defendant did testify.  He was a key witness.  You
23    were here.
24            THE COURT:  I was here.
25            MR. HAYES:  Without him, there would not have been a
```

 1    conviction, I don't think.  I suppose the expert was -- but

 2    really, without Mr. Bailynson, there was no chance of a

 3    conviction.  So we recognize he was a key witness.  However, as

 4    you pointed out, his guideline range, at a level 35, is 168

 5    months at the bottom end of the guidelines, and we agreed to a

 6    plea of 120.

 7           Now, in practice, would it have come out to 168

 8    months?  No.  I think the Court -- regardless of what the Court

 9    might have been inclined to give as a sentence, there would

10    have been a fight about possible loss amounts.  We also agreed

11    to the paid amount, not the billed amount.  But I think there

12    would have been a fight about that.  And in our experience,

13    recent experience, in particular, we never get the total billed

14    amount in terms of what the loss amount is.  And there's always

15    some discount and there's litigation over it.  So we were

16    comfortable agreeing to a 120-month sentence and avoiding that

17    battle.  However, it was a substantial haircut.

18           So now having gone down from whatever it would have

19    been under 168 months to 120 months, and now giving an

20    additional 40 percent, which the Defendant definitely earned,

21    we think that holding the line of 72 months -- we would say

22    that ordinarily, given the way the Plea Agreement worked -- and

23    I suppose it's an apples-and-oranges discussion, and we agreed

24    to the Plea Agreement, and so you can't hold that against him

25    in his cooperation.  There's some validity to that.  However,

1   we do think we have been more than reasonable.  Forty percent
2   is a good number, given his testimony, and we think it should
3   be held at 72 months.  There might be some future cooperation
4   in the cards, but we are where we are.
5       THE COURT:  Sure.  I mean, we could deal with that.
6   They had mentioned something about some cases in New Orleans
7   and other things that may generate a Rule 35 or some other
8   relief down the line.
9       But to your point, we obviously started, and we -- I
10  think you knew this going in to the plea negotiations.  It was
11  going to be in excess, due to the loss amounts, of the 120
12  months certainly.  It was negotiated to be capped at the
13  statutory max.  And so you've acknowledged to work off that
14  number for 40 percent.  So you would say to me today:  "Judge,
15  the six years that we're at, the 72 months, given everything
16  that you heard in this case, is more than sufficient to capture
17  not only his cooperation, but, in your view, should not be
18  further reduced by any 3553(a) factors"?  I surmise that's the
19  Government's position.
20      MR. HAYES:  Yes.  Because we think the 3553 has been
21  baked into the original Plea Agreement.  We'd also say:  "Look,
22  this was" -- I would admit that through his testimony -- and
23  the Court was here to observe it.  I do think that -- has the
24  Defendant turned his life around completely from what was
25  happening before?  I can't answer that.  But I can certainly

1  say that he seems to have fully accepted responsibility for his

2  actions in this case through his testimony and otherwise.

3       I mean, you saw him and he wasn't minimizing

4  everything.  However, this was a serious crime.  So just for

5  general and specific deterrence, and given the amounts, the

6  years, the amount of patients, that's another reason to hold

7  the line at 72 months.

8       I should also point out, Your Honor -- and we can

9  discuss this afterwards, but before you pronounce sentence --

10 there are -- I don't know about anyone over Zoom, but there are

11 some people here in the courtroom, victims that want to be

12 briefly heard.

13       THE COURT:  Absolutely.  And we do have, I think, two

14 victims, I believe, on Zoom as well.

15       MR. HAYES:  We've submitted their statements, Your

16 Honor.

17       THE COURT:  I got that, too, yeah.

18       MR. HAYES:  And some of those -- if they wanted to be

19 heard, I don't know.  I haven't been told by them whether they

20 actually want to be heard or not.  It would be, I think, in

21 some cases, somewhat difficult to speak openly.  But if they

22 want to, certainly they can.  But they may want to just rest on

23 their statements because this is difficult stuff.

24       THE COURT:  Yeah.

25       MR. HAYES:  Some of these statements, I think, just

1    judging from the tenor of them, may apply more to -- they apply

2    to both Defendants.  They might have thought this was more

3    about Dr. Agresti.

4              THE COURT:  Dr. Agresti.  Yeah.

5              MR. HAYES:  It's hard to tell.  And I think maybe they

6    could be heard at both.  They certainly have that right.

7              So we do have one person in the courtroom who wants to

8    be heard specifically on Mr. Bailynson.  He has to do with the

9    Green Terrace Condominium and the homeowners association, and

10   he wants the Court to know what happened there.

11             So in any case, given the seriousness of the

12   offense -- leaving aside what I will call the double haircut,

13   the seriousness of the offense, we think that 72 months makes

14   eminent sense, given the conduct and breadth and scope of time,

15   the amount of money, the vulnerability of the patients.

16   Substance abuse treatment fraud is a scourge on this community,

17   as Your Honor has noted in other sentencings.  In order to send

18   a message, we think that Defendant has earned what we've given

19   him and at this point should get no more.  I'm sure Defense

20   will have their reasons otherwise.

21             THE COURT:  Sure.

22             Okay.  No.  But that at least gives me a good sense of

23   where the Government's at.  And I appreciate that.  And what

24   we'll do, Mr. Hayes, is I'll hear 3553(a) arguments.  And then

25   I'll turn it back to you if you want to call -- you said it was

1    one person in the courtroom or two?

2            MR. HAYES:  One in the courtroom, Your Honor.  And

3    what you pointed out is there are two on Zoom.

4            THE COURT:  Okay.  All right.  I'll prompt the folks

5    on Zoom and see how they feel.  But we'll call up the one in

6    the courtroom in just a moment.  Okay?

7            All right, gentlemen.  So I'll turn it to you.  I know

8    we'll talk a little bit more.  There's some other requests here

9    regarding designation and all that.  But I think what we need

10   to focus on now is strictly the 3553(a) factors.

11           I will tell you I'm prepared to honor what you guys

12   negotiated in the Plea Agreement, work off the 120.  I'm at 72.

13   I'm not going to play games.  I'm at 72.  The argument here is

14   now:  Should he be entitled to any further reduction under any

15   3553(a) factors?  So I'll turn it to you guys.  Anything you

16   want to add on that point?

17           MR. BENJAMIN:  Thanks, Judge.

18           We have the absolute pleasure of knowing that Your

19   Honor sat within 10 feet of Mr. Bailynson for three days and

20   listened to every word out of his mouth.  Before that time, he

21   met with the Government about 20 times at their beck and call,

22   whenever they wanted him to be there.  And he was there within

23   a second to continue debriefing, preparing for trial, giving

24   information, going through records, going through his memory,

25   which I would say is quite, quite good.  And his ability to

1    recollect is so good that he was able to articulate completely

2    what happened in this case without holding back anything.

3         So if we concentrate on one thing, which is a 5K1

4    motion for a substantial assistance departure downward, we

5    haven't -- the Government used the term 40 months.  I think

6    in -- this is -- the Government would even agree that it's a

7    word of art -- it's a percentage of art, not --

8         THE COURT:  Yeah.  I think Ms. Perwin said it

9    yesterday at Agresti's sentencing.  It was:  "It's an art, not

10   a science."  You know, I've seen them do -- yesterday they did

11   25 percent.  He obviously has done a lot more than the

12   codefendants did.  Forty percent might be the highest I think

13   I've seen.  I've seen a lot of 33s and 30 somethings.  But

14   you're right.  There's no formula.

15        MR. BENJAMIN:  Sure.  And, you know, quite frankly,

16   Judge, in all the years I've been doing it, a lot of times when

17   somebody testifies at trial for three days, 50 percent is

18   thrown around a lot.  And defense attorneys argue it should be

19   lower than that because of the quality and the quantity of its

20   substantial assistance.

21        So with everything -- I think Mr. Hayes said that:

22   "Well, the deal that we made on the 10 years, there were other

23   factors involved there, not so much cooperation."  But there's

24   other loss of litigation issues that we didn't have to deal

25   with.

```
 1            So now when you talk about substantial assistance,
 2    what do you have?  We have a man who sat on the stand for three
 3    days of testimony and cross-examination from Mr. Lubin and
 4    whoever else cross-examined him, and the jury believed him
 5    hook, line, and sinker as to what happened and convicted
 6    Dr. Agresti.  And Your Honor was able to see his demeanor, his
 7    memory, and the quality of his ability to recollect things and
 8    talk about what happened.  And I think, in that, I would
 9    respectfully request that Your Honor see that he isn't the same
10    man that he was during the time this all happened, that he has
11    turned his life around completely.
12            During the time he was preparing for substantial
13    assistance, before he came in here and did his testimony,
14    during the 20 times he met with the Government, he was
15    absolutely a hundred percent perfect on his conditions of
16    release, so much so that if he hiccupped he referred to it to
17    his pretrial services officer and was absolutely perfect.
18            And he even said to us:  "You know, I know it's up to
19    Judge Ruiz to decide what, you know, my sentence is, but I made
20    a promise to the Government to come in and provide substantial
21    assistance.  If they ask me questions about anything, I will
22    answer those questions."  And he, to this day, has told us that
23    and believes that, and he will continue to do so.
24            But we're not talking about what may happen in the
25    future.  We're talking about what happened here.  And here is
```

1    20 debriefings.  The Government just put it in words that if it

2    wasn't for Mr. Bailynson's testimony, they wouldn't have been

3    able to convict Dr. Agresti.  And Your Honor heard it out of

4    his own mouth.

5            So if you isolate what substantial assistance is, and

6    the credit for that, I would respectfully request Your Honor

7    consider more than 40 percent.  Because 40 percent -- that art

8    doesn't apply to how substantial his assistance was.  It was

9    extraordinarily substantial.  It wasn't just substantial.

10   People get substantial assistance sometimes for getting

11   debriefed.  People get substantial assistance for producing

12   records.  He did the ultimate you can do on substantial

13   assistance, and that's testify against a codefendant for as

14   long as it took, three days of testimony before Your Honor.

15           So that is worth more.  If you compare -- and I know

16   everybody is different in this case.  But the other two

17   codefendants got a recommendation from the Government of 25

18   percent of their sentences.  And Your Honor went well beyond

19   that in both of those situations, in giving them the sentences

20   they got yesterday.  I'm not suggesting that a year and a day

21   is something that we would even say out loud with regard to

22   Mr. Bailynson.  But I would argue to Your Honor that there's --

23   that he deserves more than those four years off.

24           There's another thing that plays into this that's very

25   important for Mr. Bailynson.  And it's been talked about in

1    some of the pleadings, but not specifically with Your Honor.

2    He has a son who is involved -- who is the subject of a custody

3    battle since even before he got out of jail on pretrial

4    release.  He basically hasn't seen his child in person since

5    that happened.  And the battle's going on.

6         There's law that I have been made aware of by the

7    civil lawyers that say that a long sentence during the

8    formative years of a child's existence may cause him to lose

9    his parental rights to that child.

10        So I'm not suggesting that's a reason why Your Honor

11   should consider going down, but it sure shows and suggests a

12   reason why Ken Bailynson is not going to ever be that guy that

13   it states in the Indictment he did way back then.  He's a

14   changed person that is desperate to be able to be a dad.  And

15   he will do everything he can to turn his -- and has done

16   everything he can to turn his life around.  And I think that's

17   the most important showing of where he sits today and what

18   happened.  We're not at all minimizing the case.  We know what

19   it is.  But he's doing everything he can to do the right thing.

20        And so I'm asking Your Honor to consider lower.  I

21   think even below 50 percent would be good.  I don't know if

22   Your Honor would consider, but we are asking for it.  So -- if

23   you look at it as a percentage thing.

24        THE COURT:  Okay.  All right.  Was there anything else

25   you wanted to add, aside from just kind of the 5K1 percentage,

1     other characteristics?  You've touched on a few, counsel.

2     You've mentioned a little bit about -- one could argue you've

3     mentioned family responsibilities and a few other things that

4     are known under 3553(a).  But is there anything else you want

5     the Court or you want to put on record as a factor for why you

6     believe something beyond just the 72 months is warranted?

7          And there may not be.  Your focus, I think, is on the

8     cooperation.  But I just wanted to ask.

9          MR. BENJAMIN:  And the only reason I did that, Judge,

10    is I think if you concentrate on the 3553(a) factors, there is

11    more argument and suggestions to be made there.  But, you know,

12    I have to tiptoe because Mr. Hayes is right.  We agreed to a

13    Plea Agreement and we said we're not going to talk about a

14    variance.

15         THE COURT:  A variance.  Right.

16         MR. BENJAMIN:  But of course those factors are built

17    into the law that Your Honor has to consider and -- you know,

18    chance of recidivism and all those things, of course, Your

19    Honor should look at.

20         THE COURT:  And I will.

21         MR. BENJAMIN:  Of course.

22         THE COURT:  I'm considering them.  But to your point,

23    I respect that.  I know you're being -- because there are some

24    limitations you negotiated with.  So you're focusing really

25    more on the one that is more debatable, which is the percentage

1    that can be covered by the 5K.

2              MR. BENJAMIN:  And because of our agreement with the

3    Government, we'll honor it.  And so I can't do that, but of

4    course Your Honor consider all of them.

5              THE COURT:  Sure.  Okay.  Very good.

6              MR. BENJAMIN:  Is there anything else I missed?

7              THE COURT:  Now, I think the easiest thing to do is,

8    probably, if Mr. Bailynson wants to share anything with me now.

9    And then I'll call up anybody that wishes to testify from the

10   victim perspective.

11             Again, you don't have to if you don't want to, Mr.

12   Bailynson, but you're free at this point.  If there's anything

13   in terms of allocution or anything you want to add, please feel

14   free.

15             THE DEFENDANT:  I have a small prepared --

16             THE COURT:  Absolutely.  Please.

17             And you can -- if you feel comfortable removing your

18   mask, and then just bring the microphone close.

19             You may read your statement.

20             THE DEFENDANT:  Your Honor, I accept fully and

21   complete responsibility, without any excuses.  Because there

22   really is no excuse for my actions.  I apologize to all of the

23   individuals who resided at the halfway house and to all of the

24   insurance companies, and to all of the victims' families who

25   I've caused harm.  I apologize to my son, the Court, the

1    prosecutors, Mr. Stewart, and his staff, and the FBI, and

2    anyone else that I've harmed.

3          I truly am sorry for letting everyone down.  I'm sorry

4    for letting down the employees who relied upon me.  I'm sorry

5    to the addiction community as a whole and to anyone who is

6    fighting this horrible disease called addiction.

7          Give me a second.

8          I recognize the damage that I have caused and the pain

9    that I have caused all these innocent people.  Your Honor, my

10   main goal in life going forward is to establish and build a

11   relationship with my son, if I'm given the opportunity, and to

12   repay the victims that I have caused harm.

13         I'm extremely grateful that I have been given the

14   opportunity to assist the Government in their pursuit of

15   justice.  Not because it can potentially reduce my sentence,

16   but because it is the right thing to do.

17         I truly feel blessed that it has also assisted my

18   rehabilitation to get up, accept responsibility, tell the

19   truth, but also, and more importantly, I hope it assists the

20   victims to help them and bring them just even a tiny bit of

21   closure as to the events that have transpired because of my

22   conduct, which is inexcusable.  It is the very least that I can

23   do to begin to make amends for my horrible behavior and

24   actions.

25         I wanted to thank all of the correction officers,

Case 9:18-cr-80124-RAR  Document 521  Entered on FLSD Docket 05/09/2022  Page 19 of 53

19

1    counselors, doctors, and nurses for each of them doing their

2    difficult jobs and for the care and respect that they gave me.

3    I also want to thank the prosecutors, the Probation officers,

4    and Judge Matthewman for going above and beyond and making

5    efforts so that I could have time with my son, and on most

6    nights only result in me having two or three seconds with him.

7         I'm grateful for those precious seconds.  Those few

8    seconds have allowed me to see the true value of what is most

9    important in the world because those few seconds have been more

10   valuable than any amount of money.

11        I did not have a son when all of these events

12   transpired.  I have learned a lesson -- my lesson, and I can

13   assure this Court that it will never happen again.

14        I want to apologize for anyone that -- if I came

15   across arrogant during my testimony, I can assure this Court

16   that that was not my intention to do so.  It was my intention

17   to take responsibility for my actions, own them, and, most

18   importantly, tell the truth.  And that is what I did.

19        I ask Your Honor not to give up on me, to have a

20   sliver of a chance to be rehabilitated.  I want to be able to

21   show everyone that I can be a productive member of society and

22   father to my son, if I'm given the opportunity.

23        Your Honor, I yield and surrender myself to the

24   Court's decision as to what punishment you feel is just.

25        Thank you for allowing me this opportunity to speak.

Yvette Hernandez, Official Court Reporter
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698

1    I truly am sorry.

2              THE COURT:  Thank you, Mr. Bailynson.

3              At this time, if I have a member of the gallery that

4    wishes to come forward as a victim in the case.

5              Mr. Hayes?

6              MR. HAYES:  Yes, Your Honor.  The Government would

7    call, I guess, Mr. Frank Kudrna.  He's here with his counsel,

8    Mr. William Pincus.

9              THE COURT:  Come on up, gentlemen.  And just make sure

10   that we state our name for the record before giving any

11   statement, so that my court reporter can take it all down.

12             MR. PINCUS:  Your Honor, William Pincus on behalf of

13   Frank Kudrna.

14             If you'll excuse me, I'm not familiar with the

15   procedures.

16             THE COURT:  Not a problem.

17             MR. PINCUS:  On behalf of the Green Terrace

18   Condominium Association, which has been badly damaged -- and

19   the people got badly damaged by Mr. Bailynson's crimes --

20   Mr. Kudrna wanted to address the Court and explain how the

21   association has been damaged.

22             THE COURT:  Absolutely.  Please.

23             MR. PINCUS:  Mr. Kudrna, would you please address the

24   Court.

25             MR. KUDRNA:  Yeah.  My name is Frank Kudrna,

1    K-U-D-R-N-A.  I own the Green Terrace Condominium Association.

2    I bought it in a tax auction.  I had no idea the state of

3    affairs of the community at the time.

4         The biggest point I want to make when it comes to

5    Mr. Ken Bailynson is that I am afraid of him.  I'm very much

6    afraid of him.  He likes to sue people for sport, for no reason

7    at all.  I'm afraid of that because he destroys lives.

8         He has basically stolen people's homes.  There were

9    people living at Green Terrace that were older.  They had had

10   their entire life savings wrapped up in their home.  And he

11   came in, took over the board, raised the association fees to

12   over a thousand dollars a month.  And without Mr. Pincus's

13   help, he would have basically won.  Everyone would have just

14   walked away and it would not be affordable to even own the

15   unit.  Even if you had it, it was not affordable.  He destroyed

16   the entire community.  He did that by removing value from the

17   units.  I don't want to press that point here because it's not

18   related to his current crime.  I just want to give you a

19   background of why I'm afraid of him.

20        I do want to make a few points, though.  I was --

21   after he was arrested, I believe, because I don't have my phone

22   with me, because I can't bring it into the courtroom -- so I

23   don't know the dates exactly.  But I was deposed by a law firm

24   that he was suing, even though he was already -- after his --

25   maybe it was a year or two years ago, I was deposed because he

1    was suing the firm that wrote the contract giving him control

2    over the Green Terrace units.

3          So he is not a changed man, in my opinion.  He is

4    actively litigating.  He likes to litigate.  If you look at his

5    litigation history, it is scary.  He sues everybody for

6    everything.  I think it's like a sport for him to sue people.

7    I do want to make that point.  You can look that up yourself.

8    I don't have -- I apologize.  I don't have the relevant

9    documentation.  But I have been involved in several issues with

10   that.

11         When he was on the board, he represented -- he did

12   several things that are illegal and just basically rude.  Like,

13   for example, he didn't have elections in 2018, 2019, and 2020,

14   as he was supposed to.  Those are the things that I guess is

15   significant, is -- it's a complicated case.  And I don't really

16   want to get into it.  But I do want to say he served his own

17   interests.  I had a unit there.  I tried to put a for sale/rent

18   sign out.  Him and his team removed any signs that were not

19   theirs.  He doesn't play in a community.  He's totally for

20   himself.

21         It's very frustrating for me.  I own a unit there and

22   I can't even get it tented for termites.  Because since the day

23   I bought it, I realized it needed to tented.  I can't get it

24   tented.  To this day, it has not been tented for termites for a

25   variety of reasons.  It's very frustrating.

1          But at the end of the day, I just want to say I'm

2     scared of him.  And I think -- the way it was explained to me

3     was that during this case -- you probably know more about it

4     than I do -- there were several million dollars that were not

5     recovered.  And my understanding was there was like 17 or 14

6     million dollars that were not recovered.  And he's basically

7     looking at six years in prison.  And when he gets out, he's

8     going to have -- theoretically will still have a lot of money.

9     And he probably has ideas of suing the association for other

10    moneys that he feels is due to him as well.

11         He sues people.  It's very scary.  And I believe he

12    should be put in jail, or off the streets at a minimum, for as

13    long as possible for the safety of everyone else, because I

14    don't believe he's a safe member of society.  I mean, I don't

15    know how to express that.

16         I will probably face retribution for being here and

17    testifying in this way.  And I think it's worth saying a few

18    words to the Court to just emphasize that -- not just me.

19    People are afraid of him.  He's very intimidating.

20         Thank you for the time, Your Honor.  I could go

21    through more, but I don't want to waste your time on this case.

22    Thank you.

23         THE COURT:  Thank you.  I appreciate it.

24         MR. PINCUS:  Your Honor, if I may just very briefly.

25    I think Mr. Kudrna is a little nervous.

1          One of the things that would most concern this Court,

2     I imagine, is that Mr. Bailynson believes that he has a

3     $1.5 million loan to the association at 24 percent a year, that

4     he is seeking to get back and will seek to get back when he

5     gets out.  $1.5 million he loaned the association.  That was

6     money he was laundering from what he had.  Because the guy had

7     nothing before he started this fraud -- his insurance health

8     fraud, and he was laundering money through the association.

9     And it's just another crime he hasn't been charged with.  But

10    there's nobody that knows him that thinks that he's a changed

11    man.

12         We're in litigation with him.  And all my people

13    want -- I'll finish up.  All my people want is to be free of

14    Ken Bailynson, and now they can be.  We would walk away from

15    the suit.  He has nothing to win.  He still wants to fight.

16    That's who he is.  Thank you, Your Honor.

17         THE COURT:  Thank you.  Thank you both.

18         Do I have anyone on Zoom?  I do believe I have a few

19    folks on Zoom that are participating.  If you can hear me -- I

20    hope you can.  I see someone's raising their hand.  And so I'd

21    like to give that person an opportunity, if I could.

22         And what I'm going to do is, if I have, I believe,

23    someone on their iPhone that has been identified -- if they

24    wish to speak, I can go ahead and allow you to do so.  You

25    don't have to turn on your camera.  But I just want to make

1    sure that you unmute yourself.

2          So whoever it is that wants to speak before I proceed

3    in this case, now would be the time.  You can go ahead and

4    unmute.  And you need to state your name clearly for the

5    record.

6          Who do I have that wants to speak on the Zoom?

7          I see someone raising their hand.  So whoever that is,

8    you're free to go ahead and speak, if you want to unmute

9    yourself.

10          MS. O'BRIEN:  Okay.

11          Here I am.  I'm sorry.

12          THE COURT:  It's okay, ma'am.  And if you can state

13    your name for the record, please.

14          MS. O'BRIEN:  Yes.  My name is Sharon O'Brien.  And I

15    have a little bit of an echo here.

16          THE COURT:  I know.  There's a little bit of an echo,

17    Ms. O'Brien.  If you could do your best.  Go ahead, and if you

18    could, as you just heard the last gentleman speak regarding his

19    experience, say a few words, please, for the Court's

20    consideration.

21          MS. O'BRIEN:  Yes.  Yes.  Thank you so much for this

22    opportunity.  I'm going to say that I was not surprised, but I

23    was surprised at receiving a letter for the victim's statement.

24    And I know I got a little bit lengthy.

25          But I want to mention -- I was listening to the

1   hearings yesterday on the two children -- and I say children --

2   that were involved in this, along with what I just heard for

3   the hearings on Mr. Bailynson.  And I'm a parent of a drug

4   addict that overdosed 13 days after he left Good Decisions.

5   And I just feel as though these people that are taking such

6   advantage of the victims, they're just -- they're no different

7   than the drug dealers themselves.  And I say this because it's

8   not the first time that I had encountered this.  This is the

9   second time.  My son was hooked up with a pill mill.

10          Can you still hear that echo?  I'm so sorry.

11          THE COURT:  We hear you well.  I know you may hear it,

12   but you're coming across very clear.

13          MS. O'BRIEN:  Okay.  Great.

14          So anyways, back when this whole harrowing epidemic

15   started, my son knew what was going on.  He knew he was an

16   addict.  He had a doctor from the Pittsburgh area (audio

17   distortion) give him pills.  And that doctor is Dr. Herndon.

18   He had been sentenced to jail and he was found guilty.

19          When my son finally wanted to, you know, take --

20   embrace getting sober, I did everything I could to get him

21   home, down to Florida.  I even went with him on his last drug

22   deal so that he would get on the airplane and take this and

23   embrace this moment.

24          And I then come to learn that -- I came down and

25   visited him when he was at Good Decisions.  He was sent to be

1    drug tested.  And he told me:  "Mom, I'm going to be awhile."

2    And he came back like five minutes later.  And we joked about

3    this.  And he said:  "Oh, that's funny.  Wow.  They've never

4    done that before.  They didn't test me."  And I said:  "That's

5    funny.  They probably hit the insurance."  And then, lo and

6    behold, this all comes out.

7         I just want to say that I feel so -- I guess a little

8    irritated with the hearings that I'm hearing because I just

9    feel that these people are professional people.  I know

10   Mr. Bailynson, probably that isn't his expertise.  He's a CPA.

11   But we put our faith into the professional people that we seek

12   out for and we run into brick walls.

13        So I wonder and I question all of this.  How do you

14   trust anybody?  Where was his help?  Was he really being drug

15   tested?  Were they -- they didn't have him at their best

16   interest.  Of course they didn't.  It was all money driven.

17   And it just sickens me to know that I have to sit here and

18   listen to how he can't see his son.  But let me tell you, those

19   three minutes that you get every moment that you can is way

20   more than I get right now because my son is deceased and

21   overdosed 13 days after he came home.

22        I know the other two hearings yesterday -- I want to

23   say that my heart goes out to those two.  I know they were

24   victims of the same circumstance.  They might have been aware

25   of what was going on.  But Mr. Bailynson is an adult.  He knows

```
 1    what he was doing, why he was doing it, and it cost people's

 2    lives.  It destroyed families.  And the same with Mr. Agresti,

 3    who I will be listening to tomorrow.

 4          I can't thank you enough for this opportunity.  But

 5    let's just not forget that these people are no different than

 6    the drug dealers.  They have blood on their hands.  And I'm a

 7    victim of all of that, I'm sorry to say.

 8          Your Honor, thank you so much.  I appreciate what

 9    you're doing.

10          THE COURT:  Absolutely, ma'am.  Thank you.  I'm glad

11    we were able to make the Zoom available, so it was easier for

12    you to participate.  But thank you for taking the time to speak

13    with the Court.  I do appreciate it.

14          MS. O'BRIEN:  Certainly.

15          THE COURT:  With that being said, I don't believe I

16    have anyone else on the Zoom that wants to contribute.  If you

17    do, please let me know, but I don't see anyone else --

18          MS. O'BRIEN:  That other person -- oh, I'm sorry, Your

19    Honor.  That other person -- that is my iPhone.  The other is

20    my iPad.

21          THE COURT:  Oh, okay.  Whoever else is there that

22    wants to go ahead and speak, please -- I'll go ahead and allow

23    you to do so, if you want to go ahead and unmute yourself and

24    state your name for the record.

25          MR. HAYES:  They are both her.  That's what she's
```

```
 1    saying.

 2              THE COURT:  Oh, they're both her?

 3              MR. HAYES:  One's her phone.  One's her iPad.

 4              THE COURT:  Oh, okay.  Thank you.

 5              I was not following that.  I thought she was

 6    indicating that there was another person there.

 7              All right.  So I think at this point -- there was no

 8    one else in court, right, Mr. Hayes, that you wanted to flag

 9    for me?

10              MR. HAYES:  That's correct, Your Honor.

11              THE COURT:  Okay.  Anything you wanted to respond

12    before I proceed with pronouncing sentence?

13              And I think the only thing really to address, if you

14    wanted to, was to talk a little bit in response to counsel's

15    suggestion that the cooperation should be more than 40 percent.

16    I don't know if you want to say anything on that.

17              MR. HAYES:  I don't think we have much more to say,

18    Your Honor, other than to Ms. O'Brien, who I'm sure is still

19    listening.  We're all very sorry for her loss.

20              MS. O'BRIEN:  Thank you.

21              MR. HAYES:  That factors into -- and Ms. O'Brien, we

22    will be contacting you after this because Dr. Agresti's

23    sentence is actually May 27th.

24              THE COURT:  We'll give you a link for that one too.

25    So we just have to reset it.
```

1          MS. O'BRIEN:  Thank you.

2          MR. HAYES:  In any case, Your Honor, I don't have much

3    to say, other than we think, given the seriousness of this

4    crime, there has to be a sentence.  And we think six years,

5    given the conduct, is fair, and that the 40 percent adequately

6    encompasses the Defendant's cooperation at this point, which

7    has been substantial, but this was a serious crime.

8          So looking at them both, we think 40 percent is fair.

9    But I'm not going to disagree with what Mr. Benjamin says.

10   There are some people who got 50 percent.  Even in cases that

11   I've been in recently, I will say there was someone who

12   testified in two trials that got 50 percent.  So there are

13   other people -- I know that there are people that have gotten

14   more than 40 percent for testifying once.  I think it is -- as

15   Your Honor points out, it's usually 33 percent.

16         As Ms. Perwin said yesterday -- and she's absolutely

17   correct -- it's more an art than a science.  And we think here

18   the art indicates that 40 percent is more than adequate.  So we

19   would just say that we think a 72-year sentence -- a 72-month

20   sentence -- pardon me -- is fair.

21         THE COURT:  All right.  Well, with that being said, a

22   couple things the Court will delve into here before I pronounce

23   sentence.  You know, obviously, I'm going to be granting the

24   motion that is currently on the docket in terms of the 5K.  And

25   that's Docket Entry 505.  So that will be granted.

1           And at a minium, as I stated when he began, the Court

2     is inclined to follow the Government's recommendation of 40

3     percent down to 72 months.  And so the debate, as counsel

4     pointed out, is whether or not any additional cooperation

5     should be granted.  And I want to be clear -- although I think

6     Defense counsel did a good job of pointing out the limitations

7     of the Plea Agreement -- the Court's determination today also

8     takes into account all the 3553(a) factors, some of which

9     Mr. Bailynson himself in his allocution talked a little bit

10    about, the history and circumstances -- or history and

11    characteristics, really, pertaining to him, his family, et

12    cetera.

13          You know, I think we have to remember, as Mr. Hayes

14    pointed out, where we started.  I know we have a Plea Agreement

15    here that has put us at 10 years, but the loss amount was

16    staggering.  Thirty-one million.  I mean, we were at

17    160-something months.  If it weren't for the Plea Agreement, he

18    would be looking -- let's mute Ms. O'Brien, if we could.

19          Thank you.

20          MS. O'BRIEN:  Sorry.

21          THE COURT:  It's okay, Ms. O'Brien.

22          The challenge here for the Court is we're starting at

23    a very high point already that is getting a very swift break,

24    if you will, because of the Plea Agreement.  And it brings us

25    all the way down to the statutory maximum.  So we have to

1    recognize, because we're talking numbers here, just how vast

2    this fraud was.  And so, as a starting point, we're already

3    moving down to 10 to honor the Plea Agreement, which I fully

4    intend to do.

5         And when we talk about going beyond that due to

6    cooperation, I don't for a second doubt -- and again, jurors

7    may have not only really believed Mr. Bailynson, but truly

8    disbelieved Dr. Agresti, who also testified.  I mean, it was

9    probably more than just one factor.  But that being said, I

10   will agree with the Government that without Mr. Bailynson's

11   cooperation and testimony, the trial against Dr. Agresti would

12   not have come to pass.

13        And truthfully -- we talked a little bit about this

14   yesterday at the codefendant's sentencing for Matthew Noel and

15   and Stephanie Curran.  They did not know enough to play a role

16   when it came to Dr. Agresti.  They really only knew some of

17   what Mr. Bailynson did.  So again, pointing out that

18   Mr. Bailynson's cooperation and ultimately his three days of

19   testimony were instrumental.

20        The challenge becomes when I look at that cooperation,

21   and I look at the 72 months, and I think about the seriousness

22   of the offense and the nature and circumstances of the offense,

23   and who it preys on, you know.  It preys on the weakest in

24   society, due to this urine collection, this liquid gold, as was

25   stated by Mr. Bailynson and others, to bilk insurance companies

1    to these extravagant amounts.  And this is not, in my view at
2    least, your average Medicare fraud case because it has this
3    underlying component of preying on those that are the weakest
4    in society.  And it's heart wrenching because it's not only the
5    weakest; it's those that are weak and trying to get clean.
6         So as our victim just stated, it's people who are in
7    rehabilitation and hoping that -- these urine tests are
8    designed to keep them on the straight and narrow -- that the
9    treatment processes they are being put on are designed for
10   their well-being, when we know it literally was a cash cow
11   mechanism for Mr. Bailynson.
12        And it has been, I don't know, probably a month since
13   the trial.  And I cannot get out of mind sitting here and
14   watching Mr. Bailynson say -- and I'm probably going to quote
15   it -- "If you didn't catch me, I would have made two billion."
16   I know because the jurors were aghast.  I was aghast.  He
17   started at one billion.  But I think when you questioned him
18   further -- I forget who was asking him -- he said he would get
19   to two billion.
20        The amount of avarice and greed that was displayed,
21   even during this rehabilitation portion of their life, was
22   stunning to me.  And I can sit here and say that you are not
23   truly responsible and should serve a sentence that is
24   commiserate with the wrongs you did.  And to me, already
25   getting the six years -- I would say it's quite light.  I mean,

1   I was somewhat blown away by the 40 percent when that 5K hit.

2   But I had a moment of reflection and I recognized that,

3   truthfully, Mr. Bailynson, without your cooperation, nothing

4   would have happened in the Agresti case.  So I recognize that.

5         But for me to sit here, even if I had the

6   wherewithal -- and I do -- to really throw out the cooperation

7   and focus only on 3553(a), I look at all of these factors.  And

8   I think to myself:  "Okay.  Sure.  We have remorse today."  But

9   when you look at the history and characteristics you exhibited

10  throughout this fraud, which took awhile.  I mean, this wasn't

11  an overnight thing.  This was -- it was a long period of time,

12  several years of drumming up this fraud.  The amounts that you

13  made off this, off the backs of those who thought they were

14  getting good treatment, you know, to me, it would be almost

15  impossible to find a sentence-based reason to go below the 40

16  percent and give you something less than 72 months.

17        Because at the end of the day, if I did that, it would

18  seriously not promote respect for law.  It would basically make

19  a charade of the seriousness of the offense.  And we have to

20  think of something that's sufficient but not greater than

21  necessary to comply with the guidelines when we do these

22  sentences.

23        And to me, we'll see -- obviously, we have

24  Dr. Agresti's sentencing yet to come.  But I mean, if we had to

25  define the kingpin of this entire operation, it is you.  It is

1    you.  You are the leader of this thing.  You are the architect

2    of this thing.  And it it's sad, because you are the brilliant

3    mind behind this thing, because you're an extremely smart man.

4    You have squandered your gifts.  You spent it gambling.  And

5    then from gambling to, you know, this entire fraud with the

6    healthcare industry, with the urine, with the testing.

7         But I mean, I listened to your testimony.  You were

8    able to use what you observed to be loopholes within our

9    trust-based and insurance-based system to really manipulate

10   reimbursements to an extreme level.  And that's not something

11   that doesn't require a certain level of sophistication.

12        So it is a depressing fact.  Because who knows what

13   you could accomplish and truthfully what you will accomplish

14   because you are not -- I know you have your health conditions.

15   I've read them.  But I strongly believe that you have a lot of

16   life ahead of you even after a sentence of 72 months.  And I

17   think to myself:  If you could turn and use any of these

18   abilities for good, how much good you could do for the

19   community if you could make a true turnaround and serve as a

20   true redemption story.  You could do it.  You have the tools.

21   You are a smart, capable man, educated, with ability.

22        But you also are a greedy person, with a lot of anger.

23   You were able to control it during the trial.  And I compliment

24   you on that.  You've done a very good job here.  And sometimes

25   that's what happens when you have children come into your life

1   that weren't around -- your son wasn't here when you were going

2   through this.  Maybe that's what's clicked.  And maybe that's

3   what's helping you kind of find your compass and get away from

4   some of these things that -- these character traits that led

5   you down this road.

6          But I cannot look at this offense and everything that

7   happened here, and say:  "You know what?  We're going to

8   continually shave this sentence down from the cooperation in

9   the Agresti trial."  Because what it really will create, in my

10  view, truthfully, is also a bit of a sentencing disparity.

11  Because if you look at 72 months, that's about five times more,

12  in my calculation, than what Mr. Curran [sic] got.  And that's

13  about right.  Because truthfully, you are five times more

14  responsible, if not more, than the two souls that came in here

15  yesterday, and were bit players in your scheme and also in

16  recovery.  You absolutely should be getting a sentence

17  magnified several times more than theirs.

18         So it would promote, actually, an elimination of

19  disparity by holding you to 72 months.  And anyone could argue

20  that 72 months, arguably, based upon the amount of fraud that

21  was committed here, is light.  It's light.  I mean, even for

22  someone with a criminal history category I, this was no small

23  fraud.  I mean, it is $31,356,527 that you are going to be held

24  responsible for, it seems.  We'll talk in a little more detail

25  about that.  But as a restitution amount, that's a starting

```
 1    point that we're working with.

 2              And so, to me, looking at your fingertips throughout

 3    this entire -- your fingerprints, rather, throughout this

 4    entire plan, the way you manipulated individuals and had people

 5    going through this process and doing all this repeated

 6    unnecessary urine testing, and knowing how to manipulate and do

 7    it, I just cannot -- even though your counsel's made a strong

 8    argument, and he's not wrong, that there may be circumstances

 9    under which folks can garner 50 percent or higher -- it would

10    essentially run afoul of everything 3553(a) has us look to.  It

11    just would.  It would not promote respect for the law.  It

12    would not reflect your characteristics.  Certainly at the time

13    that you went through this, you were I think on your way to

14    becoming a changed person.  But it would simply ignore the

15    unbelievable greed that I saw firsthand from the witness stand

16    for three days.

17              And yes, on some points of your presentation here, I

18    do believe that you're beginning to have some remorse.  But I

19    am concerned.  I am concerned because there were parts of who

20    you are that I saw during that trial.  And I sincerely believe

21    that this will be the only time you go through the criminal

22    justice system.  But, you know, there is a part of you that

23    needs a lot of work and it deals with that outsmarting others,

24    that greed, and that anger which led you to do this and led you

25    really to manipulate a lot of individuals, to their detriment.
```

```
 1              And so, with all that being said, the Court cannot --
 2      cannot abide by any further reductions.  To me, six years
 3      reflects the seriousness of this offense.  It certainly -- it
 4      certainly eliminates sentencing disparity.  And it will, in my
 5      hope, truthfully -- I mean, I think we have to recognize -- we
 6      talk a lot about general deterrence and whether general
 7      deterrence is something that works in the white-collar
 8      healthcare fraud space.  Sadly, if it worked as well as it
 9      should, we wouldn't see these cases brought over and over
10      again.  So the message is maybe not getting through and maybe
11      it doesn't necessarily work.
12              But at least in this space, in the sober home space,
13      in this particular arena, I sincerely hope that your misdeeds
14      in this space, with these types of folks who are looking at you
15      for treatment, who you ultimately used for fraudulent
16      reimbursements -- that this will send a message that at least
17      in this district we will not tolerate this kind of manipulation
18      of that segment of society in recovery for Medicare fraud gain.
19      And so I do sincerely hope there is some sort of general
20      deterrence element from a six-year sentence that will send a
21      message to others who believe that this is the new frontier.
22              You know, there seems to be a new frontier every day.
23      If it's not genetic testing, it's something else, and it's
24      sober homes; it's something else.  It's a Whac-A-Mole game,
25      sadly.  Something comes up every couple of years and it's a new
```

1    subset of Medicare fraud.

2            But I can tell you that, as far as I'm concerned, this

3    segment needs to come to an end, and come to an end fast.  And

4    one of the ways that I believe we can do that is making sure

5    that we have sentences that reflect that this is not something

6    that we will tolerate in a civilized society, and that our

7    system cannot tolerate on preying on the weak and innocent.

8            Regardless of the criminal history I, $31.3 million

9    requires sentence that reflects cooperation, but can go no

10   lower.  And so I am not going to sentence you to anything less

11   than the 72 months that the Government has agreed.  And I

12   really do that almost reluctantly.  Because no matter how good

13   the cooperation was, you know, we have to realize that this is

14   in excess of the statutory maximum scored, and I believe

15   truthfully that you are at the heart of this entire scheme and

16   the mastermind of this thing and used abilities that God has

17   given you for wrong, for bad things, to manipulate others.

18           And I truly hope -- I truly hope that, despite the

19   sentence, you will find some solace in your son, find some

20   solace in trying to become part of his life.  It sounds like

21   the custody battle is something that I will have no impact on.

22   It's a different realm for me than the family courts, as your

23   counsels know.  But my only sincere hope is that this sentence

24   will not completely remove your ability to spend time with your

25   son one way or the other.  Because at the end of the day, I do

1    think your son is important to your own recovery.  And he's a

2    young child, and you can really shape a life for him to respect

3    and look up to you, that will not be tainted by your experience

4    in the criminal justice system today.

5         So the Court has considered the statements of all

6    parties, the Presentence Report which contains the advisory

7    guidelines and the statutory factors as set forth in 18 USC

8    3553(a).  It is the finding of the Court the Defendant is not

9    able to pay a fine.  However, restitution shall be ordered and

10   it will be to be determined.  We'll set a hearing to determine

11   that amount of restitution.  We know that statutorily it's two

12   times the amount of -- as we discussed when we began.  But

13   we're going to hold off on putting a number on that until we

14   give the parties a chance to discuss some offsets.  I know

15   there's property and other things that have been forfeited.

16        So it is the judgment of the Court that the Defendant,

17   Kenneth Bailynson, be committed to the Bureau of Prisons to be

18   imprisoned for a total of 72 months as to Count 1.

19        And we will go ahead, and just for the record -- even

20   though the restitution is going to be determined, it will be

21   joint and several with the codefendants.  And during the period

22   of incarceration, it will be made as follows:  If the Defendant

23   earns wages in a Federal Prison Industries or UNICOR job, the

24   Defendant must pay 50 percent of the wages earned toward the

25   financial obligations imposed by this judgment in a criminal

```
1    case.

2             If the Defendant does not work in a UNICOR job, the

3    Defendant must pay a minimum of $25 per quarter toward the

4    financial obligations imposed in this order.

5             Upon release from incarceration, the Defendant shall

6    pay restitution at the rate of 10 percent of monthly gross

7    earning, until such time as the Court may alter that payment

8    schedule in the interests of justice.

9             The US Bureau of Prisons, the US Probation Office, and

10   the US Attorney's Office shall monitor the payment of

11   restitution and report to the Court any material change in the

12   Defendant's ability to pay.

13            These payments do not preclude the Government from

14   using any other anticipated or unexpected financial gains,

15   assets, or income of the Defendant to satisfy the restitution

16   obligations.

17            The restitution shall be made payable to the Clerk of

18   Court.

19            Now, upon release from imprisonment, the Defendant

20   shall be placed on supervised release for three years.

21            Within 72 hours of release, the Defendant shall report

22   in person to the Probation office in the district where

23   released.

24            While on supervised release, the Defendant shall

25   comply with the mandatory and standard conditions of supervised
```

1    release, which include not committing any crimes, being

2    prohibited from possessing a firearm or other dangerous device,

3    not unlawfully possessing a controlled substance, and

4    cooperating in the collection of DNA.

5            The Defendant shall also comply with the following

6    special conditions:  Association restriction, financial

7    disclosure requirement, no new debt restriction, permissible

8    search, healthcare business restriction, and unpaid

9    restitution, fines, or special assessments, as noted in Part F

10   of the Presentence Report.

11           It is further ordered the Defendant should pay

12   immediately to the United States a special assessment of a

13   hundred dollars.

14           That brings the total sentence to 72 months'

15   imprisonment, three years' supervised release, restitution to

16   be determined, and a hundred dollar special assessment.

17           For the record, restitution hearing will be set for

18   June 22nd at 3:00 p.m.

19           Should the parties reach an agreement before then, you

20   can submit it to the Court.  We'll cancel it.  But let's get it

21   on calendar, so that we have it on there.  We'll put it in our

22   order.

23           Forfeiture of the Defendant's right, title, and

24   interest in certain property is hereby ordered, consistent with

25   the Plea Agreement.  The United States shall submit a proposed

1    order of forfeiture within three days of this proceeding.

2              Now that sentence has been imposed, does the Defendant

3    or his counsel object to the Court's findings of fact or to the

4    manner in which sentence was pronounced?

5              MR. BOGENSCHUTZ:  Your Honor, we do not object.  We

6    would, however, request the Court to give us just a moment or

7    to two to address one other matter.

8              THE COURT:  We will in just a second.  We do have a

9    couple more things to address.

10             MR. BOGENSCHUTZ:  Yes, sir.

11             THE COURT:  Now, you have the right to appeal the

12   sentence imposed.  Any Notice of Appeal must be filed within 14

13   days after the entry of the judgment.  If you are unable to pay

14   the cost of an appeal, you may apply for leave to appeal in

15   forma pauperis.

16             So we have a couple other things left to do.  But I

17   believe -- Mr. Hayes, at this time, do we have other counts you

18   want to dismiss?

19             MR. HAYES:  Yes, Your Honor.

20             The Government seeks now to dismiss against this

21   Defendant Counts 2 through 12, 13, and 14.

22             Also, Your Honor, we ask that Docket Entry 319, which

23   is the signed forfeiture order -- if the Court could just

24   incorporate it by reference now and make it part of the

25   judgment.

```
1              THE COURT:  Yes.  It will be incorporated by
2     reference.  I'd just put that on, and we'll make sure that's
3     already on the record.  I will be incorporating it by
4     reference.  It will be referenced in the judgment and sentence.
5              And to be clear, all remaining counts against
6     Mr. Bailynson are hereby dismissed, pursuant to Government's
7     ore tenus motion.  So that will be reflected in the judgment
8     and sentence as well.  So -- and again, we're going to go ahead
9     and make sure that -- I think it's Docket Entry, for the
10    record, 319.  The forfeiture order is going to be incorporated
11    into the judgment.
12             Now, remaining we have a couple of recommendations.
13    First we need to deal with a recommendation regarding
14    designation, Docket Entry 481, which I'm absolutely amenable to
15    doing.  You guys had entered a request that option one be FCI
16    Camp Miami, option two be FPC Pensacola.  Is that still the
17    request?
18             MR. BOGENSCHUTZ:  Yes, Your Honor, it is.
19             THE COURT:  Okay.  I will go ahead and grant that and
20    put that recommendation in to the Bureau of Prisons.
21             Was there anything else in terms of recommendations
22    you wanted me to make in the sentence?
23             I don't know -- for example, I didn't read anything
24    about -- well, I mean, there may be a dispute as to whether he
25    has any substance abuse issues.  But I wondered if RDAP is
```

1    going to be requested.

2                MR. BOGENSCHUTZ:  It is, Judge.  And I respectfully

3    refer to the substance abuse part of the PSI, where it shows he

4    has a whole history of --

5                THE COURT:  He did have a history of it.  Yeah.

6                MR. BOGENSCHUTZ:  And obviously not many -- we don't

7    believe, any participating in any kind of substance abuse -- we

8    would ask the Court to recommend that.  I know the Bureau of

9    Prisons has some guidelines on that.  It's going to be up to

10   them whether or not they will put him in.

11               THE COURT:  But at least that will increase your odds.

12               MR. BOGENSCHUTZ:  Thank you, Judge.

13               THE COURT:  So we'll have both recommendations for

14   location.  And then we'll put in RDAP as well.

15               That brings us to the last motion, I believe, that the

16   Court needs to address.  It is Docket Entry 480, Motion for

17   Voluntary Unescorted Surrender.  There's essentially a request

18   that he be given a surrender date, correct?

19               MR. BOGENSCHUTZ:  That is correct, Judge.

20               THE COURT:  There's a representation on this as well

21   that the Government is not objecting to this request; is that

22   right, Mr. Hayes?

23               MR. HAYES:  That's correct, Your Honor.

24               THE COURT:  All right.  And it's my understanding that

25   he is also assisting on other cases.  I read something in there

1  regarding some other pending cases that are circling there in

2  Paragraph 6.  I think one is actually -- two of them -- one of

3  them -- excuse me -- is in New Orleans set for trial on August

4  2022.

5          MR. BOGENSCHUTZ:  That is correct, Judge.

6          THE COURT:  Obviously, any cooperation that he goes

7  ahead and affords the Government will be, I'm certain,

8  reflected in any subsequent Rule 35, if that comes up, right?

9          MR. BOGENSCHUTZ:  That would be -- Judge, I think

10  there is some contention as to whether or not any further

11  recommendations would be made with respect to the cooperation,

12  if he does, in this district.  However, that's a matter in flux

13  right now.

14          THE COURT:  Okay.  Can I ask the Government -- you

15  know, one of the victims actually made a mention of it.

16  There's a lot of money we never found, right?  Is that still

17  the case, that Mr. Bailynson had some funds?  There was quite a

18  bit of money that we never -- we never located.  And you know,

19  I'm always a little worried when I have defendants

20  self-surrender that have financial means that are unaccounted

21  for.  I just -- it's worth me asking because I am slightly

22  worried about that.  And I do got to say -- although it is very

23  rare for the Court to disagree when both parties have brought

24  to me a request for self-surrender -- I am concerned that

25  Mr. Bailynson is going to be out.

1          And I will respectfully say I think his day has come.

2     And I don't know that I'm interested in letting him out.  And

3     he can go ahead and debrief for you guys from the inside of the

4     cell.  I don't know that I'm thrilled about letting him be out.

5     I got to tell you -- I know he's got a son -- this is very

6     uncharacteristic of the Court.  But this is a unique

7     circumstance.  This guy's been out for a long time.  These

8     cases have been pending for a long time.  I think it's time --

9     now that things are different, he's looking at 72 months.  I do

10    sincerely wonder whether it's appropriate for this Court to let

11    him self-surrender.

12          What do you think, Mr. Hayes, about the money?  Are

13    you worried?  I guess you guys are not.

14          MR. HAYES:  We are not worried about the money, Your

15    Honor.  I'm not disagreeing with Mr. Pincus, in that there is a

16    possibility there's some money out there.  I don't think it's

17    anything close to 14 million.  We did not find any evidence --

18    and I've just confirmed that with the agent in this case --

19    that there was anything close to $14 million.

20          I would point out, Your Honor, that these same things

21    came up and Mr. Bailynson was detained for that reason, the

22    outstanding money, for two years.  He's --

23          THE COURT:  Am I right that the only reason

24    Mr. Bailynson was out was mostly health?  I'm trying to

25    remember because there was a -- he raised during COVID a lot of

```
1    health concerns.  And I'm --

2          MR. HAYES:  I don't think that's entirely true, Your

3    Honor.  I think Judge Matthewman was more concerned that:

4    "When I put him in, I thought trial was" -- it was more COVID,

5    in that the judge said:  "When I detained him, I didn't think

6    it was going to be for this long."  But the trial just kept

7    getting put off.  And he wasn't upset that that was happening.

8    But he was like:  "I wasn't contemplating almost two years of

9    him being incarcerated."

10         So the money was also an issue, the funds outstanding,

11   when we argued for detention originally.  So I'm not going to

12   say that we didn't make the same argument.  Given the

13   Defendant's conduct up to now, he has a son, there's more

14   suasion.  He has another -- he has a place to live.  He's

15   complied with all conditions.  So he's known this sentence was

16   coming for a while.  We don't think that there's some hidden

17   trove of money that he's going to use to abscond, frankly.  We

18   just see no evidence of that.

19         But I understand what the Court is saying.  I will say

20   that this is coming up (inaudible) the Court says:  "I am

21   concerned."  But you know, since the parties were agreeing,

22   maybe he wasn't prepared to do it today.  I do think that might

23   be a little much, given that he probably has some affairs to

24   take care of, to give the Defendant 60 days.  If you don't want

25   to give him as long, that's fine.  He can debrief from inside,
```

1    certainly.

2         I just do think that the Court's concerns can be

3    addressed without it being today.  And he has complied with all

4    conditions up to this point.  So I can represent that for this

5    Defendant we are not concerned and we don't think there's that

6    substantial amount of funds outstanding.

7         THE COURT:  How much time are you guys asking for?

8         MR. BOGENSCHUTZ:  The 60 days we had asked for.  And I

9    can assure the Court that he's continued to cooperate with

10   forfeiture counsel, the civil counsel.  We even set up a

11   meeting for next week.  All of the terms of the order that Your

12   Honor enters for his judgment will be complied with.  He's

13   given up every apartment, everything, all that forfeiture

14   handles, everything other than the house he lived in for 10

15   years before this happened.

16        So he doesn't have any (inaudible) and he has lived

17   his life since he got out most perfectly.  And remember, before

18   he was facing -- you know, we didn't have the Plea Agreement.

19   He was facing the bottom of the guidelines.  And he got out and

20   lived in his house and did well.  If he had that kind of money,

21   and Your Honor had that concern, that's when the risk would

22   have been much higher.

23        Right now, he's facing six with time served of almost

24   30 months.  So you know, there's -- that would even lessen any

25   concern Your Honor could possibly have.  He's facing much less.

```
 1    And he has the opportunity to come before Your Honor to discuss
 2    further reduction if a 35 is filed.  But right now, that's his
 3    hopes.  And that would be another reason to assure the Court
 4    that your concern should be assuaged.
 5          THE COURT:  Okay.  Well, I will tell you what.  It's a
 6    close call for me.  But given the representations that have
 7    been made by both sides, the Court will grant the motion for
 8    voluntary unescorted surrender, and I will give him the 60
 9    days.  I will allow him to surrender on June 21st, as I have
10    done with the codefendants.
11          And that is truthfully because I have to have a little
12    bit of faith that he recognizes at this point in time that he
13    needs to turn a corner, that he should make the most of the
14    time he has with his son, with his family, so that he can take
15    the time to get his affairs in order and continue to assist the
16    Government, as he has up until this point.
17          But again, I just caution -- let's make sure that we
18    abide by all conditions, as we have done up until this point,
19    so that we don't have any issues between now and June 21st.
20    Okay?
21          Is there anything on behalf of the Government before
22    we conclude?
23          MR. HAYES:  Nothing from the Government, Your Honor.
24    Thank you.
25          THE COURT:  You're welcome.
```

1          Anything else from either counsel, Mr. Benjamin or

2     Mr. Bogenschutz?  Anything else, guys, I need to address?

3          MR. BOGENSCHUTZ:  No, Your Honor, except there is one

4     issue.  He just asked me about this.  We made an objection to

5     some of the time that Probation had counted that he had served,

6     approximately 800 days.  We just want to make sure that -- and

7     I'm sure it will -- that the Court's judgment and conviction

8     also reflect that number or that --

9          THE COURT:  Well, I will say this:  I don't know if we

10    have -- sometimes I've done a judgment and sentence, I've

11    gotten it down to a day, when the parties can agree on a

12    certain date.  But is your concern more about a particular

13    window of time that you want credit to be reflected for?

14         I mean, I'm always a little sensitive of getting that

15    specific, and BOP has their calculations.  Is there something

16    in particular that you believe the judgment and sentence can

17    reflect that would capture that or is it more by way of motion

18    after?  I'm not sure.

19         MR. BOGENSCHUTZ:  Judge, it may have to be by motion

20    afterwards.  But at this point, having done this for a while,

21    I'm fairly convinced that BOP is going to be able to sit there

22    and look at this and say:  "Okay.  How many days has he got

23    in?"

24         But I think the PSI will be corrected enough to

25    reflect that.  It's about 800 days.

```
 1              THE COURT:  Okay.  All right.  I would say this:  I'd
 2    rather just be able to say on the record he should be getting
 3    credit for the time he's been in.  And if the PSI reflects it,
 4    it's on there.  You've got it on the record.  If you need it
 5    for BOP in a more formal order, file the motion and I'll get it
 6    to you.
 7              MR. BOGENSCHUTZ:  Yes, sir.
 8              THE COURT:  For now I'll do that.  Because if I start
 9    putting it in the judgment and sentence, it can get a little
10    bit -- it can be a little difficult.  So let's just do that.
11    But for the record, he should get all of that credit, a hundred
12    percent.  Yeah.  Okay?
13              MR. HAYES:  Whatever BOP calculates, he'll get credit
14    for.
15              THE COURT:  Correct.  Absolutely.  And it should be in
16    line with the PSI, which I don't think there's any issue
17    with -- any objection with that.  So -- all right?
18              Anything else, gentlemen, I may have missed?  Anything
19    else you wanted to address?
20              MR. BOGENSCHUTZ:  No.  No, sir.
21              THE COURT:  Okay.  All right.  Thank you very much.
22    We're in recess.  Thank you, everyone.
23              MR. HAYES:  Thank you, Your Honor.
24              MR. BOGENSCHUTZ:  Thank you, Your Honor.
25         (Proceedings concluded at 3:36 p.m.)
```

```
 1   UNITED STATES OF AMERICA       )

 2   ss:

 3   SOUTHERN DISTRICT OF FLORIDA   )

 4                    C E R T I F I C A T E

 5          I, Yvette Hernandez, Certified Shorthand Reporter in

 6   and for the United States District Court for the Southern

 7   District of Florida, do hereby certify that I was present at,

 8   and reported in machine shorthand, the proceedings had the 20th

 9   day of April, 2022, in the above-mentioned court; and that the

10   foregoing transcript is a true, correct, and complete

11   transcript of my stenographic notes.

12          I further certify that this transcript contains pages

13   1 - 53.

14          IN WITNESS WHEREOF, I have hereunto set my hand at

15   Miami, Florida, this 9th day of May, 2022.

16

17                        /s/Yvette Hernandez
                          Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
18                        400 North Miami Avenue, 10-2
                          Miami, Florida 33128
19                        (305) 523-5698
                          yvette_hernandez@flsd.uscourts.gov
20

21

22

23

24

25
```